776 So.2d 396 (2000)
STATE of Louisiana
v.
Robert MILLER.
No. 99-KA-0192.
Supreme Court of Louisiana.
September 6, 2000.
Rehearing Denied October 6, 2000.
*399 Tyronne Clayton Brown, Timothy Ralph Saviello, Clive Adrian Stafford Smith, Counsel for Applicant.
Hon. Richard P. Ieyoub, Attorney General, Hon. Douglas P. Moreau, District Attorney, John A. Cannon, Dale R. Lee, John Warren Sinquefield, Lori Theresa Lewis Munn, Baton Rouge, Counsel for Defendant.
LEMMON, Justice.[**]
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issues involve (1) the denial of defendant's challenges for cause during voir dire; (2) ineffective assistance of counsel; and (3) the introduction of victim impact testimony during the penalty phase of the trial.[1]

Facts
Early in the morning of January 25, 1997, the sixty-seven-year-old victim was raped and stabbed to death in her home. Her son discovered the body on the floor with a sofa across her face, and he reported the murder to the police.
Detective Keith Bates visited the scene of the murder and then canvassed the neighborhood. While talking to people in the area, he learned that the victim collected rent on four nearby properties. Bates spoke with the tenants, including Linda Evans, defendant's girlfriend who lived with him in one of the rental properties. Evans told Bates that defendant seemed upset that morning and kept telling her that he loved her. She also mentioned that defendant walked her to work that morning and threw their garbage bag into a dumpster behind the drug store where she worked.
Based on that information, other officers searched the dumpster behind the drug store and found a garbage bag that contained a knife, some bloody clothing and a pair of Reebok tennis shoes. Evans identified the shoes and some of the clothing in the bag as defendant's, and the bloody sweater as the victim's.
Obtaining an arrest warrant, the police searched for defendant, and they located and arrested him around midnight the next day.[2] Bates interviewed defendant about an hour later. After a lengthy period of discussing defendant's background and other general information, defendant said to Bates, "Let's get to the point, this is about [the victim's] death." At that point, Bates again recited defendant's constitutional rights, and defendant indicated that he wanted to continue speaking with the detectives.
Asked what he had done the night of the murder, defendant explained that he went drinking with his neighbor after work. He returned home to change clothes and speak with his girlfriend, and then he went back out drinking until about 2:00 a.m. As he was walking home, he decided to pay his rent which had been due since January 18. He rang the victim's doorbell, and she came to the door and let him in the house to pay the rent. He stated that he began to feel sick and lost consciousness, speculating that someone had put something in his drink. When he regained consciousness about fifteen minutes later, the victim was bloody and appeared dead.
Bates asked defendant how the sofa fell on the victim's face, and defendant explained that he was scared and was trying to clean up the floor when he accidentally *400 dropped the sofa. When asked how the victim's underwear was ripped off of her body, defendant said that it happened accidentally as he fell when he fainted.
At trial, the prosecutor presented the foregoing evidence, and the defense rested without calling any witnesses. Based on stipulations that defendant voluntarily provided blood and hair samples and that there was an outstanding warrant at the time of the murder for defendant's arrest for violating his probation on an earlier drug conviction, defense counsel argued that defendant had been in the wrong place at the wrong time. Relying on the fact that the prosecutor could not positively match defendant's blood or hair to any of the samples taken from the scene, defense counsel argued that when defendant awoke and found what someone else had done to the victim, he panicked because of the outstanding arrest warrant, tried to clean up so that no one would know that he had been there, and left the scene. The jury returned a verdict of guilty of first degree murder.
In the penalty phase, the prosecutor offered victim impact evidence, and defense counsel called defendant's mother as the sole witness to present mitigation evidence. The jury unanimously recommended a sentence of death, finding as aggravating circumstances that defendant was engaged in the perpetration of an armed robbery and the perpetration of an aggravated rape, that the victim was over sixty-five years of age, and that the crime was committed in an especially heinous, atrocious and cruel manner.

Challenges for Cause
Defendant first contends that the trial court erroneously denied his challenges for cause against three jurors who were biased in favor of the death penalty. Defendant argues that these jurors should have been struck for cause because of their inability to fairly consider a life sentence.

1. Death Qualification of Potential Jurors

The defendant in a capital case is entitled under the Sixth and Fourteenth Amendments to an impartial jury in both the guilt and the penalty phase. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The party seeking to exclude the juror has the burden to demonstrate, through questioning, that the juror lacks impartiality. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879). The key to deciding cause challenges against prospective jurors based on views in favor of or against the death penalty is the determination of impartiality. Perhaps the most difficult tasks for the trial judge in ensuring the impartiality of a capital juror are handling the death qualification portion of the voir dire and ruling on challenges for cause to a prospective juror who has expressed his or her views toward the death penalty.
The fountainhead decision on the death qualification of prospective jurors was Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968),[3] in which the Court examined an Illinois law that authorized a cause challenge for jurors who voiced general misgivings about the death penalty. Based on that statute, nearly half of the veniremen in the case had been excused for cause. Rejecting the broad statutory authorization for challenging jurors with "conscientious scruples against capital punishment," the Court reversed the death penalty. The Court held that this statutory procedure did not result in an impartial jury as required by the Sixth Amendment, but resulted instead in a jury "uncommonly willing to condemn a man to die." Id. at 521, 88 S.Ct. 1770. *401 The Court emphasized that veniremen cannot be excluded for cause simply because they indicate there are some kinds of cases in which they would refuse to recommend capital punishment, and that a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him.
The Witherspoon decision thus involved the issue of a limitation on a state's power to exclude jurors, rather than the issue of the appropriate grounds for challenging capital jurors. However, the Court in a footnote indicated that nothing in the decision prevented approval of a death penalty imposed by a jury from which were excluded only "those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial ..., or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. at 522-23 n. 21, 88 S.Ct. 1770 (emphasis in original).
In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court approved the exclusion of four veniremen who made it unmistakably clear that, because of their opposition to capital punishment, they would not abide by existing law or follow conscientiously the instructions of the trial judge.
In Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Court held that the trial judge improperly excused veniremen who simply acknowledged that their deliberations might be affected by the possibility of capital punishment. However, the Court noted that the jurors might have been properly excused if the prosecutor had borne his burden of establishing that the jurors, because of their views about capital punishment, were unwilling or unable to follow the law or to abide by their oaths as jurors.
In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the trial judge, on the prosecutor's motion, excused a prospective juror who stated that she thought her personal beliefs against the death penalty would interfere with her sitting as a juror in the case and with her judging the guilt or innocence of the defendant. The Court, clarifying the Witherspoon decision to dispense with the reference to automatic decisionmaking and with the necessity of proving a juror's bias with unmistakable clarity, adopted the standard that "a prospective juror may be excused for cause because of [the juror's] views on capital punishment ... [when] the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Id. at 424, 105 S.Ct. 844. The Court observed that an impartial jury is one that will conscientiously apply the law, and while the prosecutor in Witherspoon was not entitled to a jury from which all persons leaning against capital punishment had been excluded, a capital defendant is not entitled to a jury chosen under a legal "standard that allows jurors to be seated who quite likely will be biased in his favor." Id. at 423, 105 S.Ct. 844.
All of the foregoing decisions that developed the "substantial impairment" standard involved prospective jurors who held views disfavoring capital punishment, and the issue was whether their exclusion from the panel deprived the defendant of an impartial jury. In the meantime, reverse-Witherspoon situations, involving jurors who held views favoring capital punishment, began to be presented to the courts.
In Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Court, in a reverse-Witherspoon situation, stated in dicta[4] that a juror who would *402 automatically vote to impose the death sentence in the penalty phase, if the defendant was convicted in the guilt phase, likely was not qualified to serve as an impartial juror in a capital case.
In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Court reversed a sentence of death because the trial court had refused the defendant's request to question potential jurors on whether they would automatically vote for the death penalty upon convicting the defendant.[5] The Court stated that a juror who will automatically vote for the death penalty after conviction will fail to consider in good faith the evidence of aggravating and mitigating circumstances as the instructions require the juror to do. The Court held that the juror's premature formation of an opinion on the ultimate question makes that juror excusable for cause, adding that the presence or absence of either aggravating or mitigating circumstances is irrelevant to such a juror.[6]
The Witherspoon, Lockett, Adams, and Witt cases involved cause challenges by the prosecutor against prospective jurors who held views against the death penalty. The present case, as did Ross and Morgan, involves challenges by the defense to prospective jurors who held views in favor of the death penalty. However, the standard for Witherspoon or reverse-Witherspoon challenges should be the samea juror should be disqualified either if the juror would automatically vote for either a life sentence or a death sentence, or if the juror's views against or in favor of capital punishment would substantially affect the juror's willingness or ability to follow the law as instructed by the judge and to abide by his or her oath as a juror.[7]

2. Voir Dire under the Louisiana Capital Sentencing Scheme

In Louisiana, a juror in a capital case must be willing to consider the imposition both of a death sentence and of a life sentence, based on all of the evidence and on the instructions given by the trial judge. At the conclusion of the evidence, a juror must find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, and then must consider any mitigating circumstances (statutory or otherwise) before determining whether or not the death sentence should be imposed. La.Code Crim. Proc. art. 905.3. See Blystone v. Pennsylvania, 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)("[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence."). While a juror has the discretion to assign whatever *403 weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence,[8] the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant (which is the focus of a capital sentencing hearing) and must be willing to fairly consider a life sentence.
The requirement that the jury must find at least one statutory aggravating circumstance in the penalty phase of the trial presents little problem during voir dire.[9] Moreover, the questioning of a juror in voir dire about whether he or she is willing to consider mitigating circumstances is, in itself, generally straightforward. However, the questioning of a juror about the importance to be assigned to mitigating evidence is particularly troublesome.[10]
There is a significant difference between a prospective juror's agreeing to consider mitigating evidence and the juror's determination of the importance of that evidence. Voir dire, of course, occurs before any evidence is presented for the jurors to consider and evaluate. During voir dire, a juror can easily commit to consider mitigating evidence.[11] However, a juror can hardly commit in advance as to the importance he or she will assign to the mitigating evidence that has not yet been detailed. Nevertheless, counsel on both sides ask jurors probing questions about mitigating evidence, hoping for an indication of how the juror might be expected to evaluate mitigating evidence. In this sensitive area, Louisiana judges generally allow broad latitude on voir dire, which is designed not only to establish grounds for challenges for cause, but also to allow the intelligent exercise of peremptory challenges (that are constitutionally guaranteed in this state). The broad scope of voir dire sometimes produces answers from a lay person that appear to be inconsistent, and the delicacy of this situation is an important factor underlying the rule that requires a reviewing court to accord substantial deference to the trial judge's rulings on challenges for cause relating to a juror's views of the death penalty.
Because of the broad scope of voir dire, some Louisiana trial judges, during the death qualification portion of voir dire in a capital case and before tendering the prospective juror for questioning by the attorneys, personally question the juror about whether the juror, after listening to all of the evidence and the instructions by the judge, can vote for a death sentence if the juror determines death is the appropriate penalty, or can vote for a life sentence if the juror determines life is the appropriate penalty; whether the juror's religious, personal or other beliefs will interfere in any way with a fair consideration of either a *404 death sentence or a life sentence;[12] and whether the juror will consider all the evidence, both aggravating and mitigating, before deciding which penalty to vote to impose.[13] In this personal questioning, the judge may also ensure that the juror understands he or she does not have to (and should not) decide on the sentence until the juror hears all of the evidence from both sides. After this introductory questioning by the judge, the attorneys ask the jurors additional questions relevant to the juror's willingness or ability to follow the law as stated by the judge and to abide by his or her oath as a juror.
The scope of the questioning by the attorneys about aggravating and mitigating circumstances often presents difficult problems. A prospective juror in voir dire knows, from preliminary questioning about the juror's familiarity with the case, some or all of the aggravating circumstances asserted by the prosecutor, but knows little or nothing about the mitigating evidence the defense will present (except perhaps, in some cases, the youth or mental retardation of the defendant). In reverse-Witherspoon cases, a prospective juror's knowledge of the particular aggravating circumstances in the case generally does not affect the juror's impartiality. However, this court has reversed several death penalties in which reverse-Witherspoon challenges by the defense have been denied, but answers to questions on the particular aggravating circumstances required disqualification of the juror. See State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320 (death penalty reversed because two jurors would not consider a life sentence when the particular case involved a premeditated murder); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526 (death penalty reversed because a juror would not consider a life sentence when the particular case involved a rape and murder); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (death penalty reversed because a juror would not consider a life sentence when the particular case involved a double murder); State v. Ross, 623 So.2d 643 (La.1993) (death penalty reversed because a juror would not consider both sentences, but would vote for the death penalty if the accused was guilty of murder).
In each of these cases, while the prospective jurors stated a willingness, in the abstract, to consider a life sentence, defense counsel established the jurors' unwillingness or inability, because of the aggravating factors in the particular case, to follow the law requiring consideration of mitigating circumstances before deciding how to vote on the sentence. In effect, the jurors in those cases stated that they would vote for death because of the aggravating circumstances in the particular case and regardless of any mitigating evidence that may be presented. Thus, the jurors' views on capital punishment in the particular case prevented or substantially impaired them from following the law under the Louisiana's capital sentencing scheme.
Answers by potential jurors to questions about mitigating circumstances have been addressed by this court in cases involving the denial of reverse-Witherspoon challenges by the defense against jurors regarding their answers. In State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, this court approved a death penalty when *405 two jurors, who initially stated that they could not consider the defendant's youth and lack of criminal history as mitigating circumstances, eventually agreed they could consider all factors presented in the penalty phase and could consider a life sentence. In State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, this court approved the denial of a cause challenge when a juror stated that he would consider mitigating evidence, but would require substantial evidence in mitigation in order to be inclined to recommend a life sentence.[14] In State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, this court allowed the denial of a challenge to a juror who would be more inclined to vote for death than for life, but would consider both and would follow the judge's instructions. In State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, this court affirmed a death sentence, although one juror in voir dire stated that the penalty should be death for a specific intent killing. However, the juror, in limited questioning, appeared to believe that mitigating circumstances only applied in accidental killing, and she stated that she would listen to both mitigating and aggravating circumstances and would "make a judgment based on what was presented." Upon review of the overall voir dire, this court concluded that the defendant did not bear his burden of demonstrating that the juror was unwilling or unable to follow the law as instructed by the judge or to abide by her oath as a juror. In State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651, this court upheld the denial of a cause challenge against a juror who believed that the death penalty for an intentional killing "ought to be the law," but agreed to abide by the judge's instructions and to consider both life and death sentences. In State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, this court held that cause challenges were properly denied under the "substantial impairment" standard for a juror who would "kind of lean" toward the death penalty, but would entertain a life sentence if the judge instructed him to do so, and for a juror who felt the death penalty was appropriate for the murder of a child, but would be open-minded and would consider all mitigating circumstances. In State v. Roy, 95-0638 (La.10/4/96), 681 So.2d 1230, this court refused to overturn the trial court's denial of a cause challenge to a juror who initially stated that he would not consider the statutory mitigating circumstance of intoxication, even if so instructed by the judge, but ultimately agreed he would consider it and give appropriate weight "depending on the case."
In each of the cases discussed immediately above involving the denial of a defendant's challenge for cause on reverse-Witherspoon grounds, the defendant failed to establish that the prospective juror's bias in favor of the death penalty would substantially impair the juror's willingness or ability to follow the law as instructed by the judge or to adhere to his or her oath as a juror.[15] By contrast, this court in Divers, Maxie, Robertson, and Ross reversed death penalties upon concluding that the defendant had established that the prospective juror's bias in favor of capital punishment would substantially impair the juror's willingness or ability to follow the law as instructed by the judge or to adhere to his or her oath as a juror.
The line-drawing in many cases of this type is extremely difficult. Accordingly, the trial judge must determine the challenge on the basis of the entire voir dire, and on the judge's personal observations of the potential jurors during the questioning. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. Moreover, the reviewing court should accord great deference to the trial judge's determination and *406 should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify the jurors' qualification or disqualification. State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845

3. Reverse-Witherspoon Challenges in the Present Case

Defendant contests the trial court's denial of cause challenges against prospective jurors Ronald Sheets, Ronald Lindsly, and Marjorie Roy. Part of the questioning of Sheets by the prosecutor included:
Q. Do you believe in the death penalty?
A. Sure do. Without a doubt.
Q. Without a doubt?
A. Yes, Ma'am.
Q. But can you listen to both sides?
A. Sure.
Q. We will present our side during the penalty phase and of course, the defendant may present evidence. And after considering the evidence presented can you personally return a death sentence against this defendant?
A. Sure.
Q. Now, if you felt that a life sentence was more appropriate could you return a life sentence?
A. I could if that's what the case, you know, turned to, but, I could, yes.
Q. What do you mean? Tell me what you mean.
A. Well, I believe in the death penalty and the fact that a person can take another man's life and have no remorse about it or whatever other than self-defense then the person needs to die, you know. Bottom line that is the way I feel about it.
Q. But under Louisiana law you are requiredit'sit's okay if a person leans one way or another either in favor of the death penalty or in favor of a life sentence. But what we are looking for and what the law mandates that we have is a person who isn't going to automatically vote one way or another without regard to the evidence. And the law requires that in deciding the penalty that you have to give a fair consideration to each side, and if the defendant presents some mitigating evidence you have to give fair consideration to it along with the state's evidence, and weigh it and decide which you think is more important, and then based on that make a decision on which penalty you think that the defendant deserves. Could you do that?
A. Sure.
Q. You wouldn't automatically vote for the death penalty?
A. No, not necessarily.
Upon being questioned by the defense attorney, Sheets agreed that he was very strongly in favor of the death penalty. Defense counsel then asked:
Q.... But let's assume for the sake of argument that they do prove thatthat he was the one that committed this particular crime, that he raped and murdered a 67 year old lady, and then we got to go into a penalty phase. Okay? Would you begiven that evidence, you have seen all of the evidence, all the gory photographs and theall of the other stuff that goes with one of these first degree murder trials, would you be kind of disposed to say, "Well, he did it, he deserves the death penalty, I don't care whether he is a nice guy or otherwise or if he was kind to his mother or what have you, he gets the death penalty." Would you bein other words, would it be more or less an automatic with you given those circumstances?
A. If he's found convicted or if he's convicted of first degree murder and it goes to the penalty phase and the choice is towards death, yes, I will lean towards death.
Q. Okay. Are you telling me that you would become somewhat impaired from considering mitigating circumstances? Say the fact that he may have served *407 honorably in the army or done this or done that?
A. It wouldn't have any bearing on the situation at all.
The prosecutor objected to the question, and the judge sustained the objection, but specifically stated, "And I'm also going to say if you want to talk about mitigating you can ask about any mitigating circumstances. I don't think his response had to do with all mitigating circumstances. I think it had to do with that particular example you gave."
Defense counsel then asked Sheets whether, if the jury found the defendant guilty of raping and murdering the sixty-seven-year-old victim, there was anything that would prevent him from automatically imposing the death penalty. Sheets responded:
A. Well, I am not agoing to automatically say, yeah, give him death, you know. If it wasdepending upon the evidence and the findings in the case and all of that if it was more appropriate for a life then that is what I would vote.
Q. Okay. Give me some examples of what you would considerwhat would influence you toward leaning toward life in prison rather than the death penalty?
A. Well, in this particular situation it would be kind of hard, you know, for a young man of his age to attack an elderly woman 67 years old. I can'tI can't see why or how anybody can even do anything of that nature. So, like I say, it wouldI can't think of any kind of situation to tell you, you know, he deserves life over the death penalty, you know in a situation like this. You know, I can't come up with an example.
Q. In other words, if you are convinced in your own mind that he was guilty of the crime as charged then it wouldn't make any difference what I
At this point, the prosecutor objected, and the judge sustained the objection. Defense counsel proceeded:
Q. You can't think of anything that would change your mind about the death penalty in that situation.
A. In this case, no sir.
Q. Even though the judge tells you thatthat you would have to consider mitigating circumstances?
The prosecutor again urged an objection, which was sustained, and defense counsel did not ask Sheets any additional questions.
In denying the challenge for cause, the judge stated:
I am not going to grant a cause on Mr. Sheets. I am very convinced that he he is open-minded to a life sentence. I think that the way that the questioning went, he tried to explain, "Yeah, I can consider a life sentence." It was evident that he was pro to the death penalty, but he didn't say that his mind was closed. He didn't sayhe did not indicate that he would not be able to discharge his duties or his oath, and for that reason I am going to deny it.
Defense counsel then used a peremptory challenge to excuse Sheets from the jury.
The voir dire of Sheets is troublesome because the trial judge incorrectly sustained an objection to a question inquiring whether, after defendant was found guilty, it would make any difference what evidence the defense presented. This sustained objection to the unfinished question involved the type of denial of voir dire that caused the reversal of the death penalty in Morgan v. Illinois, supra. However, defense counsel, unlike the attorney in Morgan, was not totally barred from questioning the jurors on their willingness to consider mitigating circumstances and to consider a life sentence. In earlier questioning, Sheets clearly stated he could consider a life sentence if defendant were found guilty of the first degree murder and would not automatically "give him death," but would consider all the evidence and vote for life if it were more appropriate. Defense counsel was concerned that, *408 and argued that, Sheets "may give lip service to the instruction" to consider any mitigating evidence and to consider a life sentence, and likely would disregard the instruction. However, the trial judge was in the best position to determine whether Sheets would discharge his duties as a juror in that regard, and the judge ruled that Sheets, although favoring capital punishment, would follow the judge's instructions. Upon reviewing the voir dire in its entirety, we cannot say that the judge erred in denying the cause challenge.
Defendant next argues Ronald Lindsly, who served as foreperson of the jury, should have been excused for cause.
When the prosecutor asked Lindsly how he felt about the death penalty, he stated that he believed in it, "especially if the person involved, whatever, was one of the main causes in the death." He further affirmatively answered questions whether he could listen to the evidence presented by the prosecutor and by the defense and could fairly consider both sides, and he affirmed that he could return either a death sentence or a life sentence, whichever he thought was appropriate.
When defense counsel asked Lindsly to explain his answer about believing in the death penalty, he stated:
A. I believe that if somebody purposefully takes somebody else's life that they are accountable for that and they deserve to die. If it were an accident that something transpired or happened then it was an accidental death associated to that, that's a different story. Just for instance, whatever, a hunting accident out in the woods. A guy shoots a bullet, or whatever, and it kills somebody, whatever. That I could determine as accidental and not a main contributing factor to the death where you purposefully went to do that.
Q. I don't gather that you meant to suggest an eye for an eye is what you would believe about that?
A. I believe in the fact that if you take somebody's life you deserve to lose your own.
Q. So then you do believe in an eye for an eye?
A. Literally the biblical terms, whatever, I don't believe that if you happen to knock somebody's eye out that you deserve to give up that eye. But I do believe that you are accountable for taking from somebody else.
When defense counsel told him the law required him to consider mitigating factors, Lindsly responded that he could, adding. "I'm pretty analytical, and I would look at all factors that come." The trial judge denied defense counsel's cause challenge without comment.
The only difficulty with Lindsly's voir dire involved the "eye for an eye" discussion with defense counsel. Nevertheless, Lindsly expressly agreed to consider both death and life sentences and to consider any mitigating evidence, as required by the statutes. The judge clearly did not err in denying the cause challenge.
Defendant finally argues that prospective juror Marjorie Roy should have been excused for cause.
During voir dire by the prosecutor, Roy gave the following responses:
Q. Do you believe in the death penalty?
A. Yes, sir.
Q. And if you thought it was an appropriate penalty after listening to the state's case and to the defense if they choose to put on something, could you personally return such a verdict?
A. Yes, sir.
Q. And also if you listen to everything and thought a life sentence was appropriate could you return a life sentence?
A. Yes, sir.
Q. Would your religious beliefs in any way interfere with your returning a death penalty?
A. No, sir. I believe like the bible said, an eye for an eye and a tooth for a *409 tooth. If you take someone's life then your life should be taken also.
Q. Okay, but you would reserve that judgment until you heard everything?
A. Oh, yes.
Q. And fairly consider a life sentence also?
A. Yes.
When defense counsel questioned Roy, the following occurred:
Q.... I notice that youin responding to [the prosecutor's] questionand I don't think you used this exact word, but what I got from the answer was that you pretty much believe in an eye for an eye type
A. Yes, sir.
Q. That you do believe that?
A. Yes.
Q. Now, you understand
A. I read that in the Bible just the day before yesterday.
Q. Ma`am?
A. I read that in the Bible just the day before yesterday, when a person's life is taken then the person that killed that persons life should also be taken. And just a few verses below that it said an eye for an eye and a tooth for a tooth.
Q. And you understand that in this case a person was in fact killed?
A. Yes.
Q. Now, the law in the state does not automatically provide that if the person is found guilty they have to be killed?
A. Right.
Q. Do you understand that?
A. I understand. That is just my opinion.
Q. So if you were chosen for the jury, and let's say the jury did in fact return a guilty verdict, would at that point would you automatically vote for the death penalty?
A. Probably.
Q. You said probably.
A. Yes, sir.
Q. Why do you say probably?
A. Well, I would have to wait until the circumstances
The prosecutor objected, suggesting during a bench conference that the juror first had to listen to the mitigating evidence. The judge asked defense counsel to rephrase the question, and the prosecutor suggested that defense counsel ask if the juror will listen to evidence on both sides and consider both life and death sentences, whereupon the judge noted those questions had been asked and answered. Then the questioning continued as follows:
Q.... You understand that in the penalty phase the state would be required to prove certain aggravating factors as they are called. Are you aware of that?
A. Yes.
Q. And the defendant, if he so chose, could also put on evidence of what is called mitigating factors?
A. Yes.
Q. My question is that since the defendant would have been convicted in the first phase would you considerwould you give the same weight to the mitigating factors as you would to the aggravating factors? Would you consider them fairly?
A. Yes.
Q. And if in your mind you were convinced that life imprisonment should be a sentence would you then imposevote to impose life imprisonment?
A. I am not sure that I could. The lady got no choice. She didn't get a second chance.
During the argument on defendant's cause challenge, the judge asked the prosecutor to respond to Roy's "eye for an eye" attitude, explaining:
[B]ecause I don't think that there is any person of any rationality that cannot hear that and begin to question whether this person was making lip service to your questions and not being directly *410 honest, and then her true emotions come out when she quotes the biblical passages. That's my concern.
The prosecutor then argued that the bible-quoting juror's religious beliefs indicated her honesty in stating she would consider a life sentence. Defense counsel responded that the juror, after a guilty verdict, "is going to leapfrog into the bible and do the eye for an eye." The judge denied the challenge, stating:
I did have the chance to observe her and watch her while [the prosecutor] questioned her on theon whether or not she could listen to the aggravating and mitigating circumstances. Sheshe appeared to understand exactly what he was talking about. She also appeared to be quite candid in saying, yes, I could and, yes, I could consider a life sentence. And so for that reason I do believe that she will be able to perform her duties as a juror. And I am going to deny your motion for cause on that juror.
Although Roy stated that she probably would vote for death if defendant was found guilty of murder, she immediately qualified her answer that she "would have to wait until all the circumstances ...," at which time she was interrupted by an objection. Thereafter, she affirmatively answered defense counsel's question whether she would consider both mitigating and aggravating factors fairly.
Roy also equivocated at the end of voir dire on whether she could vote for life (because the victim "didn't get a second chance") if convinced this was the appropriate sentence. However, the trial judge considered the overall voir dire and concluded that Roy had "candidly answer[ed] that she could consider a life sentence." Although the lack of rehabilitation by the prosecutor as to the last answer, when viewed alone, weighs against the trial judge's conclusion, we cannot say the judge, who was truly concerned whether Roy's emotional quotation of biblical passages affected her stated ability to fairly consider voting for a life sentence, erred in denying the cause challenge based on the overall voir dire.

Ineffective Assistance of Counsel
Defendant claims ineffective assistance of counsel in three respects. First, defendant argues that the trial judge's erroneous rulings on his challenges for cause were compounded by his attorney's failure to conduct a thorough and effective voir dire. He argues that his attorney rendered ineffective assistance on voir dire by failing to challenge prospective jurors for cause who should have been challenged, and by failing to pursue basic reverse-Witherspoon voir dire.
Second, defendant contends that he received ineffective assistance of counsel because his attorney did not object to the prosecutor's attempt to eliminate potential jurors on the basis of race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Defendant argues that it was ineffective for his attorney, whose Batson objection after the prosecutor used peremptory challenges to strike two black jurors was overruled, not to pursue challenges when the prosecutor ultimately used four, of the ten strikes that he exercised, to excuse black veniremen.[16]
Third, defendant argues that he received ineffective assistance of counsel because his attorney failed to prepare his case adequately for the penalty phase. Defendant contends that his attorney failed to investigate and develop mitigating evidence, and when the attorney called only a single witness, defendant's mother in the penalty phase, he failed to ask her about mitigating events such as the abuse and the head injuries defendant suffered as a child and a family history of mental illness.[17] Defendant further asserts that his attorney made only a cursory closing argument which did not mention mitigation or give *411 the jury any reason not to vote for the death penalty.
In response, the prosecutor argues the extensive criminal experience of the two defense attorneys, the numerous motions filed and pre-trial hearings conducted by them, the interviews of several prospective mitigating witnesses,[18] the filing for a sanity commission, and the hearsay statement of a psychologist that found defendant had no mental problems. In rebuttal, defendant points out that much of the prosecutor's argument is beyond the record.
A claim of ineffectiveness is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on appeal. See, e.g., State v. Peart, 621 So.2d 780, 787 (La.1993). The same approach is followed in capital cases. When the record permits, this court may reach the merits of complaints about counsel's performance and may grant relief if appropriate. State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35, cert. denied, 522 U.S. 1124, 118 S.Ct. 1070, 140 L.Ed.2d 129 (1998) (several errors at the penalty phase, including counsel's failure to make an opening statement, to investigate and present available mental health evidence and a twelve-sentence closing argument resulted in the jury's not having benefit of relevant and admissible material, requiring a new penalty hearing); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1291-1293 (counsel's tepid opening at the penalty phase admitting unreadiness coupled with failure to present mitigating evidence, prepare witnesses, object to inadmissible unadjudicated other crimes evidence or make a closing argument required a new penalty phase); State v. Myles, 389 So.2d 12, 31 (La.1979) (failing to offer mitigating evidence followed by perfunctory and lackluster closing argument which did not emphasize the jurors' legal obligations designed to prevent arbitrary imposition of capital punishment required a new penalty hearing).
In the present case, the record, standing alone, does not establish ineffective assistance of counsel. Indeed, defense counsel, in order to meet the prejudice prong of the standard in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), probably will need a post-conviction evidentiary hearing to present mitigating evidence that allegedly was available and not used at trial. Moreover, the prosecutor did not attempt at trial to produce evidence that defendant's representation was adequate because that was not then at issue, and opportunity should be provided to rebut what is now asserted to be mitigating evidence that should have been presented (and, of course, is not in the record on appeal). It is for these very reasons that effective assistance claims are generally relegated to post-conviction proceedings, where both sides will have an opportunity to present evidence on the issue. We conclude that such a procedure is appropriate in this case.

Victim Impact Evidence
Defendant contends that he was improperly denied a pretrial hearing allegedly required by State v. Bernard, 608 So.2d 966, 972 (La.1992), and that the prosecutor introduced inadmissible victim impact evidence at the penalty phase of the trial.
In Bernard, this court held that the use of victim impact evidence requires pretrial notice to the defense. The court likened the required notice to that governing the admission of other crimes evidence, stating that the defense, upon request, "is entitled to notice of the particular victim impact evidence sought to be introduced by the prosecutor and to a pretrial determination of the admissibility of the particular evidence." Id. at 973. (emphasis added).[19]
*412 In the instant case, the prosecutor filed a notice of intent to introduce victim impact evidence and a request for a hearing. Defense counsel then filed a motion for disclosure of particular victim impact evidence. At the hearing, the following colloquy took place:
Judge: With regard to the notice of intent to introduce victim impact evidence and request for hearing on that, are there any issues left open on that or is there any objection to that by the defense?
Defense counsel: I have no objection at this time, Judge, but I would like to reserve my right to object if and when it gets down to this at the trial, since [co-counsel] is not here today. I think it's an anticipatory kind of thing anyway.
Judge: Yes. Until we know what happens, I don't know that there's too much to object to is there?
Prosecutor: Absolutely. We're going toall our evidence is going to conform to the guidelines established by Payne and Bernard and their progeny, and we will not exceed the limits established by those cases.
Based on this colloquy, it does not appear that the defense was denied the pretrial determination of admissibility required by Bernard. Rather, it appears that the defense agreed to deal with the admissibility of the victim impact evidence by objecting, if necessary, during the penalty phase. Moreover, the requirement of a pretrial determination of admissibility does not encompass an evidentiary hearing at which victim impact witnesses are called to testify.
Finally, the victim impact evidence did not violate the parameters set out in Bernard.[20] The prosecutor called the victim's son, the victim's daughter-in-law, and the victim's two grandsons to present victim impact evidence. Their combined testimony totaled less than fifteen pages in the transcript, and their testimony consisted mainly of a description of the victim and the impact her death had on them in general terms. Evidence of this nature has been held admissible in the sentencing phase of a capital trial by both this court and United States Supreme Court. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); Bernard, supra. The trial court did not err in regard to victim impact evidence.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La. S.Ct. R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings *413 with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The Capital Sentence Investigation Report indicates that defendant is a black male born on August 23, 1962. He was thirty-five at the time of the offense. Defendant has never been married, but has a teenage daughter who lives with her mother in Texas. Defendant does not pay any child support and apparently has had little or no contact with the child or the child's mother.
Defendant is one of seven children born to Addie Miller. He lived with his mother and father, Lonnie Miller, in Dallas, Texas until he was about ten years old, when his mother moved with the children to Leesville. Mrs. Miller separated from her husband because he was an alcoholic, and defendant never saw his father after they left Texas. Thereafter, defendant lived in Leesville until he moved to Baton Rouge several months before the instant offense.
Defendant graduated from high school with a 3.0 grade average. Regarding his mental health, defendant's mother said that he did not have a problem that she knew about and described him as physically healthy. Defendant claims to have served in the Army Reserve from 1982 through 1987 and received an honorable discharge. After the defendant completed high school he worked at odd jobs, mainly as a carpenter.
Defendant does not have any juvenile criminal record. His adult criminal record shows that he was first arrested in June 1988 in Leesville and charged with aggravated battery. The records do not provide details about the charge, and the case was closed in July 1988. Defendant was next arrested in December 1989 and charged with aggravated rape and aggravated oral sexual battery, but the charges were dismissed in May 1992. In January 1994, defendant was arrested for simple battery and criminal trespass, and in April 1994, he paid a fine and court costs for the simple battery charge. Defendant was arrested in February 1995 for three counts of distribution of cocaine and was subsequently convicted on two of the counts. He was sentenced to serve six years, but his sentence was suspended, and he was placed on five years supervised probation. At the time of the instant offense he had violated the terms of his probation, and there was violation warrant for his arrest. Finally, on May 13, 1996, a woman reported that defendant had raped her two days earlier. An arrest warrant was issued, and was outstanding at the time of his arrest for the instant offense.

1. Passion, Prejudice or other Arbitrary Factors

The record does not provide any indicia of passion, prejudice, or arbitrariness. Both the defendant and the victim were African-American, and nothing in the record suggests that race was an issue at trial.

2. Aggravating Circumstances

At trial the prosecutor argued four aggravating factors: (1) the offender was engaged in the perpetration of an armed robbery; (2) the offender was engaged in the perpetration of an aggravated rape; (3) the victim was over sixty-five years of age; and (4) the crime was committed in an especially heinous, atrocious, and cruel manner. The jury found the existence of all four circumstances.
The victim, according to her daughter-in-law, was sixty-seven years old at the time of the offense. The testimony of the detectives, coupled with the physical evidence retrieved from the dumpster, supports the conclusion that defendant was engaged in the perpetration of an armed robbery. The testimony of the sexual assault expert supports the finding that defendant was engaged in an aggravated rape.
As to the commission of the crime in an especially heinous, atrocious *414 and cruel manner, defendant argues that the jury's finding of this aggravating circumstance was invalid because the trial judge failed to give the limiting instruction required by Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The trial court did fail to give a limiting instruction.[21] However, even if the jury's finding of a killing in an especially heinous manner was invalid (an issue we do not address), the failure of one statutory aggravating circumstance does not invalidate a death penalty if another statutory aggravating circumstance is supported by the record, as long as the evidence offered in support of the arguably unproved aggravating circumstance did not inject an arbitrary factor into the proceeding. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Sawyer, 422 So.2d 95 (La.1982). Here, three other aggravating circumstances were clearly supported by the record, and the evidence introduced to support a killing in an especially heinous manner did not inject an arbitrary factor into the proceeding.

3. Proportionality Review

The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Welcome, 458 So.2d 1235 (La.1983). Nevertheless, this court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979).
Jurors in the Nineteenth Judicial District have recommended imposition of the death penalty on approximately seventeen occasions. A review of the capital verdicts from this district does not suggest that defendant received a disproportionately harsh sentence. See e.g. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (defendant broke into the victims' home, armed himself with a kitchen knife and stabbed the two elderly victims to death; convictions reversed and sentences vacated because trial court erred in failing to sustain defendant's challenge for cause to an objectionable juror); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8 (convictions and sentences affirmed). Moreover, a state-wide review of cases reflects that jurors often return the death penalty when innocent adult victims have been robbed or raped and murdered in or near their home or car. See State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Eaton, 524 So.2d 1194 (La.1988); State v. Wingo, 457 So.2d 1159 (La.1984); State v. Glass, 455 So.2d 659 (La.1984); State v. Celestine, 443 So.2d 1091 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983). Compared to these cases, it cannot be said that the death sentence in this case is disproportionate.

Decree
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either, (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for *415 rehearing, the trial judge shall, upon receiving notice from this court under La. Code Crim. Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La.Rev. Stat. 15:567 B, immediately notify the Louisiana indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
CALOGERO, C.J., dissents and assigns reasons.
CALOGERO, Chief Justice, dissenting.
I respectfully dissent from the majority opinion with regard to the reverse-Witherspoon challenges in the present case. I agree with the majority that the line-drawing in this type of case is very difficult. Nonetheless, the risk that the trial judge's denials of the defendant's challenges for cause might have "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." Morgan v. Illinois, 504 U.S. 719, 736, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (internal quotations omitted).
The majority creates a slippery slope in granting the trial judge unbridled discretion during voir dire when ruling on challenges for cause in capital cases, and thus effectively overturns a long line of precedent established by this court. True, the trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686-87. However, "a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to the law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). I would find, for the reasons set forth below, that the trial judge abused his discretion in failing to excuse for cause jurors Ronald Sheets and Marjorie Roy.
Contrary to the majority's reasoning, I find serious error in the trial judge's handling of the voir dire of Ronald Sheets. In Morgan, 504 U.S. at 729, 112 S.Ct. 2222, the Supreme Court made clear that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Furthermore, as the majority here recognizes, the defendant has the burden of establishing that the prospective juror's bias in favor of the death penalty would substantially impair the juror's willingness or ability to follow the law as instructed by the judge or to adhere to his or her oath as a juror. Ante, p. 405. Where the defendant is hindered in his ability to inquire into the juror's willingness to follow the law and to consider mitigating circumstances, the defendant's right to an impartial jury and a fundamentally fair trial is brought into serious question. Moreover, absent adequate voir dire, the trial judge cannot fulfill his responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence. Morgan, supra, at 729, 112 S.Ct. 2222.
In this case, the majority acknowledges that the trial judge incorrectly sustained the State's objections to certain of defense counsel's questions of Mr. Sheets.[1] Notwithstanding *416 its recognition of the trial judge's error, the majority dismisses any prejudicial effect of the error on the basis that defense counsel was not "totally barred from questioning the jurors on their willingness to consider mitigating circumstances and to consider a life sentence." Ante, p. 407. However, I am not so willing to ignore the fact that the defendant was effectively precluded from examining the prospective juror on the crux of the issue before us, that is, whether the juror could follow Louisiana law and consider mitigating circumstances before imposing sentence, rather than automatically voting for the death penalty should the defendant be found guilty. Here, the trial judge did not allow the defendant a sufficient opportunity to develop his inquiry into whether the juror will in good faith consider evidence of mitigating circumstances as the law requires. Consequently, the defendant was denied his right to an adequate voir dire so as to identify unqualified jurors.
Even though defense counsel was denied the opportunity during voir dire to develop fully his inquiry into the prospective juror's ability to follow the law, there is ample evidence in the record to establish that both Ronald Sheets and Marjorie Roy should have been excused for cause. This court has reversed several death penalty cases in which reverse-Witherspoon challenges were denied when answers to voir dire questions on the particular aggravating circumstances required disqualification.[2] Mr. Sheets's and Ms. Roy's answers fall squarely into the pattern found unacceptable in this line of cases.
This court has held that a potential juror who indicates that he will not consider a life sentence, but will instead automatically vote for the death penalty under the particular factual circumstances of the case before him, is subject to a challenge for cause. State v. Maxie, 93-2158, p. 23 (La.4/10/95), 653 So.2d 526, 538; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1284. Mr. Sheets's voir dire answers as a whole indicate that in this case he would not have considered a life sentence if the defendant were to be found guilty of first degree murder. When defense counsel asked Mr. Sheets for some example of what he would consider or what would influence him to lean toward life in prison rather than the death penalty, Mr. Sheets responded:
Well, in this particular situation it would be kind of hard, you know, for a young man of his age to attack an elderly woman 67 years old. I can'tI can't see why or how anybody can even do *417 anything of that nature. So, like I say, it wouldI can't think of any kind of situation to tell you, you know, he deserves life over the death penalty, you know in a situation like this. You know, I can't come up with an example.
Additionally, when defense counsel later asked Mr. Sheets if he could think of anything that would change his mind about the death penalty, in this case, where a young man killed a sixty-seven-year-old woman, Mr. Sheets responded, "In this case, no sir."
The majority in upholding the trial judge's refusal to excuse the juror for cause pinpoints an earlier response where Mr. Sheets said that he could consider a life sentence if the defendant were to be found guilty of first degree murder and that he would not automatically give him death. But, as we have repeatedly cautioned, neither the trial judge nor the reviewing court should focus on one "correct" statement made by a juror during the voir dire; rather, the court should look at the totality of the juror's responses before determining the juror's fitness. State v. Lee, 559 So.2d 1310, 1318 (La. 1990). While at some theoretical level Mr. Sheets could consider mitigating evidence and a life sentence in a capital case, he surely could not do so in this case. See Maxie, 93-2158, p. 23, 653 So.2d at 538; Robertson, 92-2660, 630 So.2d at 1284. Consequently, the trial court abused its discretion in failing to excuse Mr. Sheets for cause.
Marjorie Roy should also have been excused for cause. The trial judge committed "reversible error by failing to excuse a juror whose `personal opinion' was that the death penalty should be the only penalty for first degree murder, even though the juror claimed [s]he could consider both penalties." State v. Divers, 94-0756, p. 13 (La.9/5/96), 681 So.2d 320, 327 (citing State v. Ross, 623 So.2d 643, 644 (La.1993)). During voir dire, Ms. Roy indicated that she believed in the death penalty and could return such a verdict. When the prosecutor asked Ms. Roy if her religious beliefs would interfere with her returning a death penalty, she responded, "No, sir. I believe like the bible said, an eye for an eye and a tooth for a tooth. If you take someone's life then your life should be taken also." The prosecutor then asked her if she could reserve judgment until she heard everything and could she fairly consider a life sentence, to which she replied "yes." However, when she was informed by defense counsel that the law in Louisiana does not provide for an automatic death penalty if the person is found guilty, she responded, "I understand. That is just my opinion," referring to her earlier eye-for-an-eye response.
Additionally, when defense counsel asked Ms. Roy if she would "automatically vote for the death penalty" if the jury did in fact return a guilty verdict, she responded, "Probably." Defense counsel further questioned, "[y]ou said probably," to which she responded, "Yes, sir." Moreover, at the end of the questioning when she was asked about whether she could vote to impose life imprisonment, she said that she was not sure that she could, because the victim did not get a second chance. Ms. Roy was never rehabilitated following this response, and should have been excused for cause. See State v. Cross, 93-1189, p. 8, 658 So.2d at 687.
However, it is not just the lack of rehabilitation on this question, but it is the totality of the voir dire responses Ms. Roy provided, for which she should have been excluded for cause. Ms. Roy never abandoned her opinion that the only appropriate sentence for a person guilty of murder was the death sentence. The learned trial judge should have recognized that, based upon the totality of her responses during voir dire, Ms. Roy's views on the imposition of the death penalty substantially impaired her ability to follow the law as provided under Louisiana's capital sentencing scheme.
*418 For the foregoing reasons, I dissent from the majority opinion.
NOTES
[**] Johnson, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] The police found defendant while searching an abandoned house. Defendant did not give the officers his real name, but the officers transported him to the police station because he matched a picture of the murder suspect. Once at the station, defendant identified himself as Robert Miller.
[3] The Witherspoon case was decided prior to the landmark decisions in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) and in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), which set forth requirements for a valid capital sentencing procedure. The Witherspoon case thus did not have a bifurcated sentencing hearing.
[4] The statement was dicta because the potential juror was removed by a peremptory challenge and did not actually serve on the jury. Under the federal Constitution, the trial court's failure to remove for cause a juror who does not actually serve on the jury is not reversible error.
[5] The Court noted that while a jury trial is not constitutionally required in the penalty phase of a capital case, the Due Process Clause of the Fourteenth Amendment requires a sentencing phase jury to be impartial to the same extent that the Sixth Amendment requires a guilt phase jury to be impartial.
[6] There were three justices in Morgan who disagreed that the court should remove for cause a juror who would automatically vote for death after finding the defendant guilty. The dissenting views, however, were based on the fact that the Illinois statute required consideration of mitigating evidence, but did not define what constitutes a mitigating factor, thereby permitting a juror to decide for himself that there are no valid reasons why a contract killer should not be sentenced to death. The Louisiana Capital Sentencing scheme, however, defines specific circumstances as mitigating and requires jurors to consider these and any other mitigating circumstances before deciding which penalty to impose. La.Code Crim. Proc. arts. 905.3, 905.5.
[7] The courts have experienced little difficulty in excluding a prospective juror who states that he or she would automatically vote for or against the death penalty. However, these views represent opposite extremes of the spectrum. The troublesome area is the vast middle ground which involves a prospective juror who would not automatically vote for or against the death penalty, but whose views on capital punishment affect, to some degree, his or her ability to perform the duties of a juror.
[8] See Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
[9] The difficulty generally occurs when a prospective juror declares that he or she cannot consider a life sentence because of the particular aggravating circumstance in that case. See e.g., State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526 (juror could not consider a life sentence in a case involving a rape and murder).
[10] A distinction must be made between a juror's assigning importance to mitigating evidence and a juror's weighing mitigating evidence against aggravating circumstances. The Louisiana capital sentencing scheme does not require a juror to weigh mitigating circumstances against aggravating circumstances. A juror may vote for life even if there is little or no mitigating evidence. State v. Watson, 449 So.2d 1321 (La.1984). On the other hand, a juror may vote for death in the face of significant mitigating factors, as long as the juror has given those factors some consideration. A juror may assign importance to mitigating circumstances as he or she sees fit, without regard to balancing that evidence against evidence of aggravating circumstances.
[11] Indeed, a juror who refuses to do so by stating in voir dire that he or she will vote for death if the defendant is convicted in the guilt phase, regardless of any mitigating evidence to be introduced, is a juror who will not follow the law and should be excused for cause.
[12] If a juror will automatically vote for death (or for life), or if the juror cannot fairly consider a vote for death (or for life), the juror is biased and is removable for cause.
[13] Cheney C. Joseph, Jr. & P. Raymond Lamonica, 17 Louisiana Civil Law Treatise: Criminal Jury Instructions § 8.03 (1994), suggests that the trial judge in a capital case, after preliminarily instructing the prospective jurors on the bifurcation of the trial into guilt and penalty phases, initially question the venire persons on, among other things, whether the prospective juror will consider evidence in the penalty phase as to the circumstances of the offense and the character of the defendant and then fairly consider imposing the death penalty. If the trial judge does so, he or she also should inquire whether the juror will consider the penalty phase evidence and then fairly consider imposing a life sentence.
[14] The Lucky case illustrates the significant difference between a juror's considering mitigating evidence and the juror's assigning importance to that evidence.
[15] Of course, this is the same standard applied in challenges by the state based on the juror's bias against the death penalty.
[16] One African-American served on the jury.
[17] Defendant's mother's testimony was less than five pages in the transcript.
[18] Defense counsel interviewed defendant's mother, his doctors, his minister, his high school principal, and one of his elementary school teachers.
[19] In State v. Bannister, 95-2366 (La.App. 4 Cir. 12/18/95), the trial court ruled that an evidentiary hearing is not required for the pretrial determination of the admissibility of the victim impact evidence, and the court of appeal peremptorily granted the defendant's writ application and held that "[t]he defense is entitled to a hearing and pretrial determination of the admissibility of the victim impact evidence." This court reversed, holding that the requirements of Bernard had been satisfied. State v. Bannister, 96-0188 (La.3/2/96), 670 So.2d 1223, 1224 (per curium).

In State v. Gomez, No.2000-KK-0566, presently pending in this court, one of the issues is whether the prosecutor can be compelled to produce the victim impact witnesses at a pretrial evidentiary hearing.
[20] Two broad categories of victim impact evidence may be admitted: information revealing the individuality of the victim and information revealing the impact of the crime on the victim's survivors. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Thus, some evidence depicting the impact of the loss on the victim's survivors is permitted, but the evidence may not descend into detailed descriptions of the good qualities of the victim, particularized narrations of the sufferings of the survivors, or the opinions held by the survivors with respect to the crime or the murderer. Bernard, 608 So.2d at 972.
[21] There was no request for this instruction and no objection to its omission. However, this court's decision not to review unobjected-to errors in the sentencing phase only applies prospectively from the decision of State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162.
[1] After Mr. Sheets stated that death rather than a life sentence is the appropriate penalty for a young man who attacks and kills a sixty-seven-year-old woman, defense counsel asked whether any evidence would make a difference to the juror if he were convinced that the defendant was guilty. The State's objection to the question was sustained. When Mr. Sheets stated that "in this case" he could not think of anything that would change his mind about the death penalty, defense counsel asked if that were so, "[e]ven though the judge tells you thatthat you would have to consider mitigating circumstances." Again the State successfully objected to defense counsel's inquiry. See Ante, pp. 406-407. Defense counsel's intent was clear. In response to an earlier State objection to this line of questioning, defense counsel argued that he was trying to show through his questions that Mr. Sheets was taking the position that, if the defendant were convicted of the crime, the juror would not consider mitigating evidence before imposing the death penalty.
[2] See State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320 (death penalty reversed because two jurors would not consider a life sentence when the particular case involved a premeditated murder); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526 (death penalty reversed because a juror would not consider a life sentence when the particular case involved a rape and murder); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (death penalty reversed where a venire member stated his opinion that death was appropriate sentence for a double murder, even though he also stated he could perform his duties according to the judge's instructions); State v. Ross, 623 So.2d 643 (La.1993) (first degree murder conviction reversed because a venire member said he could "consider" both the death penalty and life imprisonment, but "personally" would "vote" for capital punishment as "the only penalty in a murder trial").