# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-158

STATE OF LOUISIANA

VERSUS

RANDY KEITH BALDRIDGE, II
A/K/A RANDY BALDRIDGE

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 85046
HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
## JUDGE

**********

Court composed of John D. Saunders, Phyllis M. Keaty, and Jonathan W. Perry, Judges.

**CONVICTION AFFIRMED, SENTENCE VACATED, AND REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**

Annette Roach
Louisiana Appellate Project
Post Office Box 1747
Lake Charles, Louisiana 70602-1747
(337) 436-2900
Counsel for Defendant Appellant:
    Randy Keith Baldridge, II

**Keith A. Stutes**
**District Attorney**
**Post Office Box 3306**
**Lafayette, Louisiana 70502-3306**
**(337) 232-5170**
**Counsel for Appellee:**
        **State of Louisiana**

**Jack E. Nickel**
**Assistant District Attorney**
**Post Office Box 288**
**Crowley, Louisiana 70526**
**(337) 788-8831**
**Counsel for Appellee:**
        **State of Louisiana**

**Jeffrey Landry**
**Louisiana Attorney General**
**Colin Clark**
**Chief of Criminal Appellate Section**
**J. Taylor Gray**
**Assistant Attorney General**
**Louisiana Department of Justice**
**Post Office Box 94005**
**Baton Rouge, Louisiana 70804**
**(225) 326-6200**
**Counsel for Other Appellee:**
        **Attorney General of the State of Louisiana**

**KEATY, Judge.**

Defendant was convicted of indecent behavior with a juvenile. He was sentenced to twenty-five years at hard labor with at least two years to be served without benefit of parole, probation, or suspension of sentence. Defendant appeals his conviction and sentence. For the following reasons, we affirm Defendant's conviction, vacate his sentence, and remand for resentencing, with instructions.

## FACTS AND PROCEDURAL HISTORY

Defendant, Randy Keith Baldridge, II, was charged with the first degree rape of N.M., the eight-year-old daughter of his then girlfriend.[1] A jury found him guilty of the responsive verdict of indecent behavior with a juvenile. Defendant's motion for new trial was denied, and he was sentenced to twenty-five years at hard labor with at least two years to be served without benefit of parole, probation, or suspension of sentence. The trial court denied Defendant's motion to reconsider sentence and this appeal followed.

## ERRORS PATENT

After review for errors patent on the face of the record,[2] we have discovered two such errors. The first, which involves the trial court's imposition of an indeterminate sentence, was raised by appellate counsel and will be discussed as an assigned error. The second concerns the trial court's failure to advise Defendant of the prescriptive period for filing an application for post-conviction relief. Louisiana Code of Criminal Procedure Article 930.8 provides that a defendant has two years after the conviction and sentence become final to seek post-conviction relief. The trial court is instructed to inform Defendant of the foregoing provision at resentencing.

---

[1] The victim's initials are used in accordance with La.R.S. 46:1844(W).

[2] *See* La.Code Crim.P. art. 920.

**DISCUSSION**

Eight witnesses testified at the three-day trial of this matter. Their testimony is summarized below.

*Allison Roy*

The first witness called by the State was Allison Roy, a forensic interviewer at Hearts of Hope Children's Advocacy Center (CAC). She testified that she interviewed the victim on November 19, 2015. Detective Dennis Fruge of the Acadia Parish Sheriff's Office (APSO) and Rachel Cart with the Department of Children and Family Services (DCFS) supervised the interview from an observation room. During Ms. Roy's testimony, a videotape of the CAC interview was played for the jury and admitted into evidence as State's Exhibit 1. The substance of that interview follows.

After introducing herself to the victim and asking the victim to tell her a little bit about herself, Ms. Roy asked the victim to tell her about what led to her being there that day. Ms. Roy told the victim that she should tell the truth about everything they discussed. When Ms. Roy initially asked the victim about what had happened to her, the victim answered, "I don't really know[.] I don't remember anything." She said, "I forgot about it, because I've been having a good time with my daddy. I don't have to worry about it no more [sic]." The victim later told Ms. Roy that she was raped, which she understood to be something very bad for which one could go to jail to "pay the consequences." She stated that Mr. Randy, her mother's live-in boyfriend, had raped her more than once over the course of one year. When asked to give her definition of what "rape" meant, the victim explained that Defendant put his "private" in her "private," which term she described as "where you use the restroom." She said that when Defendant raped her, he did it so hard her private

2

would sting and she would be unable to urinate for three days.  Defendant told the victim not to tell anyone, threatening to punish her if she did.

The victim stated that the first time Defendant raped her was in her room when they were staying at her grandmother's rent house.  Her brothers were asleep in another room.  Defendant asked her if she wanted to stay up late, and he told her to get in his bed and play with his phone.  Instead, she went to her room, and Defendant followed her.  Defendant shoved a pillow over her face until she could not breathe.  She passed out, but she knew Defendant put his body part in hers.  She was on her back and Defendant was on his knees, in the middle of her legs.  His private was hard, and he put it in her private and in her butt.  Another time, when she was sleeping at her grandmother's house, Defendant woke her up, grabbed her hand, and made her touch his private.  While that was happening, her mother came home from work.  Defendant yanked the victim's arm toward him and slung it down, almost breaking it.  He then hurriedly put his clothes on and went to watch television with her mom.

The victim said last time she was raped was on the previous Wednesday at her Uncle Pie's house.  She had gone with Defendant to his mother's house earlier in the day.  Defendant was drunk, acting "crazy," and running in the house.  Her brothers were in their room and her uncle was in his room.  She was sleeping in Defendant's room.  He had drunk more than six beers.  Defendant yanked off her pants and underwear, took some cream from a pinkish-red container in her mother's dresser, rubbed it on his private, and put his private in her private and in her butt.  When the victim's mother came home, Defendant put on his pants and put the victim's clothes on her.  The victim said numerous similar incidents happened when they lived at Uncle Pie's house.  She described in detail two occasions where Defendant tried to

"force" his private in her mouth, but was unable to do so because she put a pillow over her face.

On the videotape, the victim relayed several occasions when she told her mother about what Defendant had done to her, but her mother did not believe her. The victim's mother told her she had asked Defendant if the allegations were true, and he denied everything. Thereafter, her mother "kept bugging her," asking if she was sure Defendant had done what she accused him of. Her mother and Defendant punished her when she said anything about it, and Defendant called her a liar. The victim was mad at her mother because she knew what was happening and did nothing.

The victim said "Ms. Gretchen," a friend of her father, had recently asked her if anyone had been hurting her. She told Ms. Gretchen about what Defendant had been doing to her, and when Ms. Gretchen told her father, he got "very, very mad." Her father took her to the hospital where she spoke to a policewoman and had photographs taken of her private and her butt before going to be interviewed at the CAC.

Toward the end of the interview, Ms. Roy asked the victim how she was feeling. The victim said she felt good and hoped she could get the memories of what Defendant had done to her totally out of her mind. When Ms. Roy asked her how she felt about Defendant, the victim replied, "I don't know[,]" and tried to change the subject. She said that Defendant had left belt marks on her and her brothers. The victim said she wanted to live with her father because he was nice and she "didn't get whipped" there. She also said that they went out to eat more often when she lived with her father. When asked what she wanted to happen, the victim responded, "Everything to go back to normal; live with daddy and have a happy life[.]"

4

*Detective Dennis Fruge*

Detective Fruge investigated the allegations against Defendant when he worked for the APSO. He received a call on November 7, 2015, to contact a nurse at a Lafayette hospital about the possible molestation of an eight-year-old. Detective Fruge went to the hospital where he learned the last incident allegedly took place on November 4, 2015. He later observed the victim's interview at the CAC. Based on the information he gathered, he arrested Defendant.

Detective Fruge stated that he did not go to the crime scene to collect bedding nor did he gather any clothing from the victim or Defendant because of the time lapse between the date of the last alleged occurrence and when he received the call. No other suspects emerged. Thus, he did not interview anyone about the matter, nor did he get a statement or a DNA sample from Defendant.

*Dr. Rebecca Doise*

Dr. Rebecca Doise, the medical director of the children's emergency room at Women and Children's Hospital, was accepted as an expert pediatric emergency room physician. She stated that the victim went to the emergency room on November 7, 2015. Dr. Doise came into the room during the victim's physical examination by the sexual assault nurse examiner (SANE).[3] Dr. Doise did not believe a rape kit was done "because of the time of presentation and the last known contact with her alleged perpetrator." Dr. Doise created a report of the victim's examination. Her primary finding was "sexual assault by bodily force."

Dr. Doise said the victim had "an abnormal rectal exam. She had no anal wink[,] and fissuring or scarring at -- When you look at a rectum in a clock position, she had fissuring at 10, 2, 5, and 7 o'clock." The absence of an anal wink indicated

---

[3]The SANE nurse was deceased at the time of trial.

5

"that some object that was larger than the rectum was placed in the rectum and caused damage to the rectum and pain." Dr. Doise could not identify a timeline as to when that might have occurred, however, the scarring indicated that it occurred more than forty-eight hours prior to the examination. She stated that the only other possible cause of lack of an anal wink was a spinal injury or a congenital abnormality. She added that chronic constipation could cause one anal fissure, but not multiple ones.

The victim's "vaginal exam was also abnormal. She had no visible hymenial ring and she had tearing or scarring of the posterior fourchette, which is the lower portion of the vaginal opening." Dr. Doise found both of those characteristics "significant." The lack of a hymenial ring indicated "there was penetration of the vagina at some point." Dr. Doise stated that scarring of the posterior fourchette "indicates that there was penetration by something large." She believed that the victim's injuries were consistent with the history provided. The victim also had "some general vulva redness with some white cheesy material around the clitoris." Dr. Doise did not consider that significant, as it was common in young girls and could be attributed to hygiene issues. She noted that vulvovaginitis could not cause the victim's vaginal fissures.

### N.M.

The victim was eleven years old and in the sixth grade at the time of trial. She, her mother, and her two brothers had lived with Defendant for "[o]ne or two years" and had moved around a lot. They lived in Defendant's trailer, at the victim's grandmother's rent house, and at her mother's brother Joshua's, whom she referred to as her Uncle Pie, house. At the time of trial, the victim lived with her mother, stepfather, three brothers, and Pie. She stated that Defendant had touched her at her grandmother's rent house and at Pie's house. She did not remember how many times

6

it happened, but it was more than once. At Pie's house, Defendant touched her private with his private. Every time he touched her, his private went inside her private, and it hurt for "[l]ike three days." On one occasion, Defendant rubbed "some pinkish, reddish cream found in [the victim's] momma's room in her drawer" on his private, and then he put his private in her. She stated that no one else ever touched her inappropriately and she had never accused anyone else of touching her.

On cross-examination, the victim said that when she lived in Defendant's trailer, his son Dylan also lived with them. She did not recall telling her mother and Defendant that Dylan had touched her. She also did not recall telling Dylan she did not want Defendant to live with her or that she wanted her father to live with her. Finally, she did not recall telling her mother that her father or her grandfather had touched her.

The State rested its case after the victim testified.

*Kylie Meche Matthews*

The victim's mother, Kylie Matthews, was called to testify by Defendant. She explained that she raised the victim to inform her if anyone did anything inappropriate with her. When she and Defendant dated and lived together, Ms. Matthews never saw him rape or do anything sexual with her daughter. Ms. Matthews stated that during those two years, she, the victim, and her other two children lived with Defendant and his son, Dylan, at Defendant's trailer, her grandmother's trailer, her brother's house, and with Defendant's friend, Heather Romero. Ms. Matthews's friend, Summer, often came to visit, and neither she, nor anyone else, ever told her that they saw Defendant do anything inappropriate with the victim nor did they say the victim had told them any such thing.

Ms. Matthews worked at night and Defendant was in charge of her two sons and the victim and when she was not home. She stated that she was not with her

7

children as much as she had previously been, and they had begun "to act out." She worked at Love's Travel Stop until December 28, 2016. She did not recall if she worked on November 4, 2015, or during the week before the victim went to the police with her allegations. She had a baby in May of 2016, and she worked throughout her pregnancy.

Ms. Matthews recalled that when she and Defendant were together, the victim spent "[m]aybe two [weekends] the whole two years" with her father, Neville Matthews. She stated that Mr. Matthews never said anything about the victim potentially being abused, nor did he tell her that the victim made any allegations against Defendant. According to Ms. Matthews, the victim's father never paid child support, but he filed for temporary custody of the victim after the allegations were made.

The victim told Ms. Matthews that she did not like Defendant, and she complained about his strict discipline. Ms. Matthews said that Defendant used his belt to discipline her children, and that she and Defendant had argued about it. She testified that the victim never mentioned Defendant touching her, but she did say that Defendant "was playing with himself while looking at [the victim] with no panties on[,]" and that Defendant let her play on her phone while he was in bed with her, and he was touching himself. A DCFS report showed that Ms. Matthews had discussed the victim's accusations against Defendant with the victim's father, and they agreed she was lying. The report further showed that Ms. Matthews claimed the victim was always lying to get attention. Ms. Matthews testified that she now realizes that she "made a big mistake" in not believing her daughter.

Ms. Matthews stated that she did most of the laundry when she and Defendant were dating and that she never noticed any bloody sheets, towels, or underwear

8

belonging to the victim. The victim visited her pediatrician while Ms. Matthews was dating Defendant, and there was never a mention of any signs of sexual abuse.

*Randy Baldridge, Sr.*

Defendant's father, Randy Baldridge, Sr. (Mr. Baldridge), testified that he never saw Defendant do anything inappropriate with the victim. Ms. Matthews had told him that the victim "was saying that her daddy was touching her in her private spots[,]" and that the victim had previously "accused her grandpa of doing the same thing." Mr. Baldridge said Ms. Matthews did not know what to do so he encouraged her to tell someone. Not long afterward, Mr. Baldridge found himself "taking [Ms. Matthews] and [Defendant] to a social worker because [the victim] had accused [Defendant] of the same thing." Mr. Baldridge did not think Defendant "has that type of tendencies." He stated that he was aware that the victim had been seen at the hospital, but he did not know what was found.

*Dylan Baldridge*

Defendant's son, Dylan Baldridge, was thirteen and had lived with his mother for about three years when he testified at trial. Prior to that time, he had always lived with Defendant, and he had seen his mother only once. Dylan said that he and his father "were very close." Dylan stated that the victim and Ms. Matthews lived with he and his dad for about two years. They lived at the victim's uncle's house, in Maurice, and in the victim's grandmother's house.

Dylan said Defendant and the victim "were close somewhat[,]" but she did not always have positive feelings toward Defendant, and she did not like him disciplining her. The victim told Dylan that Defendant "hated her and that she wished that her dad was there." In the years Dylan lived with the victim, he never saw his dad do anything inappropriate with her. He explained that he, the victim, and her two brothers slept in the same room at the house in Maurice and at the

9

victim's uncle's house. They slept in separate rooms at the victim's grandmother's house, "but her brothers would normally go in [the victim's] room." Dylan did not recall seeing Defendant alone with the victim or them sleeping in the same room.

*Randy Baldridge, II*

Defendant was thirty-eight years old at the time of these allegations. He testified that he never raped the victim, forced her to perform oral sex, did anything sexual with her, or touched himself with her in the room. Defendant was shocked when he first heard the allegations against him in November 2015. He "couldn't believe it" and felt like "somebody was playing a joke on [him], a bad joke."

He had lived in Abbeville, Louisiana, for most of his life. In addition to Dylan, Defendant had an adult son, Garrett Hebert, and another child who had died since Defendant had been in jail. He and Ms. Matthews dated for several years. During that time, Ms. Matthews and her three kids lived with Defendant and his son, Dylan. When they all lived together in Defendant's trailer, "the kids slept all in one room." They left the trailer because Ms. Matthews got drunk one night and the neighbors complained to his landlord.

Defendant stated that the group moved to the home of one of his friends, where they all slept in the same room. Next, they lived at Ms. Matthews's grandmother's house. After that, they lived at Ms. Matthews's brother's[4] four-bedroom house. Defendant said "[a]ll the kids slept in one room[.] They all liked to be together, sleep together." Defendant was arrested while they lived there.

During the time they lived at that house, Ms. Matthews began working nights at Love's Truck Stop, and Defendant was alone with their children. He kept the car, and he and the children picked up Ms. Matthews from work "[p]retty much every

---

[4] Ms. Matthews's brother is who the victim referred to as her Uncle Pie.

night." Defendant stated that the victim did not like him or Dylan, and that she told him "multiple times that she just wished I wasn't around and her dad would be there because she wanted me out of the picture, out of her mom's life."

The victim wanted to live with her father because Defendant disciplined them. The children had no discipline with their father. Defendant first testified he only whipped the victim once with his hand, but he then said he had corrected her with his hand or another object "[a] couple of times." He said he "was tough on them, but [he] wasn't abusive to them[.]"

The victim never brought any of her allegations to Defendant personally. Defendant had a sexual relationship with Ms. Matthews, and the victim had seen them being intimate. They also kept pornography at the house. The victim once found a pornographic video in he and Ms. Matthews's room and the children were punished from their games for a few days after he found them watching it. Defendant and Ms. Matthews also kept lubrication in their bedroom drawer, which the victim knew about from "digging in the room."

Defendant testified the victim had made allegations against her grandfather, her father, and Dylan. One day, the victim and Dylan were playing on a trampoline, and the victim "ran up and said [Dylan] had messed with her." However, Dylan said he "body-slammed her on the trampoline" but did not otherwise touch her. After a while, the victim's story changed to agree with what Dylan had described to him.

According to Defendant, Ms. Matthews never told him that the victim had accused him of molesting her. Defendant stated that he had "left [Ms. Matthews] a couple of times over the situation where she wouldn't correct her kids behind sexual behavior [sic], and [Defendant] wanted her to seek counseling to get [the victim] help." When asked about Dr. Doise's testimony that the victim had vaginal and anal

scarring, Defendant responded that those findings were "grinching [sic] to the stomach to hear[.]"

Defendant claimed that the victim lied in her CAC interview. He said Ms. Matthews did not go to work on the day the victim accused him of last raping her. Defendant explained that he was upset during the trial because he was "being pinned as a monster for something [he] didn't do[.]"

## *Assignment of Error Number One*

Defendant argues that the evidence was insufficient to prove, beyond a reasonable doubt, the elements of either indecent behavior with a juvenile or the charged offense of first degree rape. He notes that he has consistently denied the charges against him and maintained his innocence.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821.

The factfinder's role is to weigh the credibility of witnesses. *State v. Lambert*, 97-64 (La.App. 3 Cir. 9/30/98), 720 So.2d 724. "Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review." *Id.* at 727. Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law."

12

> *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

Indecent behavior with a juvenile is the commission of "[a]ny lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons[.]" La.R.S. 14:81(A)(1). "It is well-settled that a victim's testimony alone is sufficient to support a verdict as long as that testimony was believed by the trier of fact and that testimony does not contain internal contradictions or irreconcilable conflicts with physical evidence[.]" *State v. Hypolite*, 13-1365, p. 12 (La.App. 3 Cir. 5/14/14), 139 So.3d 687, 696, *writ denied*, 14-1242 (La. 1/23/15), 159 So.3d 1056. In *Hypolite*, the victim described what the defendant did, but her testimony was inconsistent with her pre-trial statements. Nevertheless, the jury weighed her testimony and chose to believe it. This court found the evidence sufficient to convict the defendant of aggravated rape and affirmed the conviction.

In this matter, the victim's testimony at trial was consistent with what she told the CAC counselor a few days after the last time that Defendant allegedly raped her. There was medical evidence showing that the victim had physical findings consistent with the type of sexual abuse she described. Clearly, someone abused the victim.

She testified Defendant was the offender. Accordingly, her testimony alone is sufficient to prove that Defendant committed at least one lewd or lascivious act on the victim when he was thirty-eight years old and she was eight years old. Thus, we conclude that the State sufficiently proved beyond a reasonable doubt that Defendant was guilty of the elements of indecent behavior with a juvenile under the age of thirteen. Defendant's first assigned error lacks merit.

## *Assignment of Error Number Two*

Defendant was exposed to a sentence of two to twenty-five years for his conviction for indecent behavior with a juvenile under the age of thirteen. *See* La.R.S. 14:81(H)(2). He was sentenced to twenty-five years, and now contends that his sentence is both excessive and indeterminate. He further argues that the trial court erred in considering the effect his crime could have on the victim as no evidence was offered to show that she suffered any psychological injury.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 01-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042 (citations omitted), *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:

In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789 (citations omitted), *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061. "While the trial judge need not articulate every aggravating and mitigating circumstance outlined in [La.Code Crim.P.] art. 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

This does not mean, however, that the trial judge's failure to comply with Article 894.1 renders a sentence invalid, as the goal of this article is articulation of the factual basis for a sentence, 'not rigid or mechanical compliance with its provisions.' *State v. Lanclos,* 419 So.2d 475, 478 (La.1982). Accordingly, if "the record clearly shows an adequate factual basis for the sentence imposed[,] . . . remand is unnecessary, even where there has not been full compliance with Article 894.1." *Id.*

*State v. H.A., Sr.*, 10-95, pp. 25-26 (La.App. 3 Cir. 10/6/10), 47 So.3d 34, 50. "The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La.Code Crim.P. art. 881.4(D).

"Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent." La.R.S. 14:41(A). "[A]ny sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La.R.S. 14:41(B). The sentence for first degree rape of a child under the age of thirteen, the crime with which Defendant was charged, is mandatory life imprisonment when the State does not

15

seek a capital verdict. La.R.S. 14:42(D)(2)(b). The record does not indicate the State sought such a verdict here.

In contrast, "[i]ndecent behavior with juveniles is the commission of [a]ny lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons." La.R.S. 14:81(A)(1). The sentencing range for indecent behavior with a juvenile under the age of thirteen is imprisonment at hard labor for two to twenty-five years with at least two years served without benefits. La.R.S. 14:81(H)(2). "[M]aximum sentences are to be reserved for the most egregious and blameworthy of offenders within a class." *State v. Telsee*, 425 So.2d 1251, 1253 (La.1983).

In this matter, the jury rejected the charged offense of first degree rape and found Defendant guilty of the responsive verdict of indecent behavior, which does not require a finding of vaginal or anal sexual intercourse. Nevertheless, at sentencing, the trial court remarked:

> Dr. Doise, the pediatric ER physician, examined the victim and determined that she had, in fact, been assaulted, both vaginally and anally. That is the conduct that got Mr. Baldridge convicted of this crime.
>
> . . . .
>
> Mr. Baldridge, on these same facts, could have been convicted of first degree rape in which case he would be sentenced mandatorily to life without the possibility of parole. So only a sentence at the very high range is called for in this case, in my view.
>
> And in fact, since, after hearing the evidence and getting the verdict it has been my thought that only a maximum sentence could be imposed in this case.

The trial court found that Defendant "abused the position of authority" as the victim's mother's boyfriend. It considered the most serious aggravating factor to be the severity of the crime, and it believed a sentence less than the maximum of

16

twenty-five years at hard labor "would deprecate the seriousness of this particular offense." In mitigation, the trial court considered the lack of a significant criminal record and noted that Defendant maintained a close relationship with his family. Defendant was sentenced to twenty-five years imprisonment, "with at least two of those years without benefit of parole, probation or suspension of sentence."

Defendant's Pre-Sentence Investigation (PSI) showed that he was convicted of criminal trespass, aggravated assault; and disturbing the police in 1997. He was again convicted of disturbing the peace in 1998. Later that year, he was convicted of careless operation. Defendant was convicted of distribution of a false controlled dangerous substance in September 1998. He was sentenced to two years at hard labor, suspended, with two years active supervised probation with special conditions. Defendant's probation was revoked because of allegations regarding possession of a firearm, leaving the state without permission, and failing to comply with court-ordered monetary obligations. He was ultimately released on parole, and he completed his parole supervision in May 2000. Defendant was convicted of operating a vehicle while intoxicated in 2003. In 2014, Defendant was convicted of domestic abuse battery involving the victim's mother, Ms. Matthews, and was sentenced to serve sixty days in the parish jail. According to the PSI, Defendant is officially classified as a second felony offender.

In *State v. Langley*, 06-1041 (La. 5/22/07), 958 So.2d 1160, *cert. denied*, 552 U.S. 1007, 128 S.Ct. 493 (2007), the defendant was charged with first degree murder but found guilty of second degree murder. After his conviction was overturned, he was re-indicted for first degree murder. The supreme court held that the jury verdict of guilty of second degree murder in effect acquitted the defendant of first degree murder. Applying that rationale here, the jury verdict of indecent behavior acquitted Defendant of first degree rape. Thus, it stands to reason the trial court could not

17

consider the elements of first degree rape, an offense of which the jury acquitted Defendant, in imposing sentence. The jury did not convict Defendant of first degree rape "on these same facts." While the evidence did show that the victim had experienced vaginal and anal penetration at some prior time, the jury convicted Defendant of a lesser charge that did not require a factual finding of vaginal or anal penetration by him. The trial court erred in crafting a sentence based on facts the jury did not find. Accordingly, we have not considered the elements of vaginal and anal penetration in evaluating whether Defendant's sentence is excessive.

The victim in *State v. Jones*, 51,941 (La.App. 2 Cir. 4/11/18), 247 So.3d 1066, was nine years old, and the defendant was her sixty-five-year-old grandfather. Testimony showed the defendant inappropriately touched the victim. A witness testified that the defendant "dated her mother about 30 years prior, when she was seven to nine years old[.]" *Id.* at 1069. The witness stated that the defendant had made her perform oral sex on him and had often touched her inappropriately. The second circuit affirmed the defendant's sentence of ten years at hard labor but remanded the case for resentencing because only one year of the sentence was to be served without benefits, instead of the statutorily-required two year minimum.

The State relies on *State v. Washington*, 51,818 (La.App. 2 Cir. 4/11/18), 245 So.3d 1234, *writ denied,* 18-783 (La. 12/17/18), 259 So.3d 343, to argue that Defendant's sentence is not excessive. The defendant in *Washington* was convicted of molestation of a juvenile, a crime with a sentencing range of twenty-five to ninety-nine years at hard labor, more severe than for a conviction of indecent behavior with a juvenile.

This court has found, "It is not required that the record show that the victim actually suffered specific psychological harm after having her childhood distorted by Defendant's behavior." *State v. Urena*, 15-1065, p. 10 (La.App. 3 Cir. 4/6/16),

18

215 So.3d 813, 820, *writ denied*, 16-1209 (La. 5/19/17), 219 So.3d 336. Similarly, the second circuit has found that "psychological injury . . . seems inherent" in the crime of indecent behavior with a juvenile. *State v. Brown*, 27,182, pp. 4-5 (La.App. 2 Cir. 8/23/95), 660 So.2d 123, 126.

We conclude that the trial court erred in considering elements of the crime charged that are not elements of the crime convicted; however, it did not err in considering the psychological harm to the victim when imposing Defendant's sentence. In addition, while the circumstances in *Washington* are not sufficiently similar to those herein so as to have bearing on the appropriateness of Defendant's sentence, we, nevertheless, find that Defendant's sentence is excessive.

Defendant also argues that his sentence is indeterminate. His conviction carries a sentencing range of imprisonment for two to twenty-five years at hard labor, with at least two years of the sentence to be served without benefit of parole, probation, or suspension of sentence. *See* La.R.S. 14:81(H)(2). The trial court imposed the twenty-five-year sentence "at hard labor with at least two of those years without benefit of parole, probation[,] or suspension of sentence."

Louisiana Code of Criminal Procedure Article 879 states, "If a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence." The defendant in *State v. Ducote,* 18-60 (La.App. 3 Cir. 11/14/18), 260 So.3d 627, *writ denied*, 18-2026 (La. 4/22/19), 268 So.3d 298, was convicted of eight counts, included one for second degree kidnapping. With regard to that count, the trial court imposed a sentence of "forty years at hard labor with at least two years to be served without benefit[s]." *Id.* at 631. On appeal, this court declared that portion of the defendant's sentence indeterminate and remanded the case to the trial court "for resentencing on the conviction for second-degree kidnapping." *Id. See also Jones*, 247 So.3d 1066.

19

In sum, we conclude that the trial court erred by imposing an indeterminate sentence that did not specify the term to be served without benefits and by imposing an excessive sentence. Accordingly, this matter must be remanded for resentencing.

*Assignment of Error Number Three*

Defendant argues that the trial court erroneously denied his right to present a defense and to impeach the victim's testimony when it disallowed the admission into evidence of Ms. Matthews's work records from Love's Travel Stop. Those records, Defendant contends, would have shown that Ms. Matthews was not at work on November 4, 2015, and would have lent credibility to his testimony that Ms. Matthews was with him on that date. Defendant contends the records met the requirements of La.Code Evid. art. 803(6), which allows the admission into evidence of:

> A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. . . .

"Extrinsic evidence of authenticity as a condition precedent to admissibility is not required" of "[c]ertified records of a regularly conducted business activity in criminal cases . . . that meet[] the requirements of [La.Code Evid.] Article 803(6), as shown by a certification of the custodian or another qualified person[.]" La.Code Evid. art. 902(11)(alterations ours).

Conversely, La.Code Evid. art. 803(7) allows the Love's records to be used as evidence to show when Ms. Matthews was not at work. That article allows admission of:

Evidence that a matter is not included in the memoranda, reports, records, or data compilations, in any form, kept in accordance with the provisions of Paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved unless the sources of information or other circumstances indicate lack of trustworthiness.

*Id.* Without these statutorily-recognized exceptions, business records would be inadmissible as hearsay.

The hearsay rule has its roots in the fundamental right of a defendant to confront his accusers. There are several exceptions to the hearsay rule one of which is contained in La.Code Evid. art. 803(6), which allows the introduction of records kept in the course of a regularly conducted business activity. However, this exception requires "the custodian or other qualified witness" to testify regarding the preparation or circumstances which produced the business record sought to be introduced. A qualified witness need only have familiarity with the record-keeping system of the company and the ability to satisfy the foundational requirements of La.Code Evid. art. 803(6). *State v. Marston,* 00-589 (La.3/16/01), 780 So.2d 1058, *quoting United States v. Console,* 13 F.3d 641, 657 (3rd Cir.1993).

*State v. Gordy*, 07-1032, p. 3 (La.App. 3 Cir. 3/12/08), 981 So.2d 45, 48. The first circuit has also held:

Evidence admissible as a hearsay exception under Article 803(6) does not require a showing of the unavailability of the declarant for hearsay purposes because Article 803(6) rests on the premise that the out-of-court statement is superior to what is likely to be produced in court. See State v. Marston, 2000-0589 (La. 3/16/01), 780 So.2d 1058, 1063 (per curiam). However, under Article 803(6), it is essential that a custodian or other qualified witness testimonially explain the record-keeping procedures of the business and thus lay the foundation for the admissibility of the records. [*State v.*] Juniors, [ 03-2425 (La. 6/29/05),] 915 So.2d [291,] 326-327[, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006)]. The witness laying the foundation for the admissibility of business records need not have been the preparer of the records; however, the witness must be familiar with and able to testify from personal knowledge about the bookkeeping and accounting procedures of the entity whose business records are sought to be introduced. Juniors, 915 So.2d at 327.

*State v. Duhon*, 18-593, p. 53 (La.App. 1 Cir. 12/28/18), 270 So.3d 597, 633, *writ denied*, 19-124 (La. 5/28/19), 273 So.3d 315. Thus, even with the business records

exception, a party must still lay a proper foundation for the introduction of such records.

The Love's records were offered with the sworn affidavit of the company's payroll representative. The affidavit stated that the representative had access to the records and was familiar with how they were produced. The affiant certified "that the Records were made at or near the time of the occurrence of the matter set forth therein or from information transmitted by a person with knowledge of and a business duty to record or transmit those matters." Finally, the affidavit stated the records were kept in the regular course of business.

Defendant cites *State v. Esteve*, 11-1889, p. 5 (La.App. 1 Cir. 5/3/12), 92 So.3d 1058, 1062, *writ denied*, 12-1214 (La. 11/2/12), 99 So.3d 663, to argue he was not required to show the unavailability of the affiant for trial purposes because "the out-of-court statement is superior to what is likely to be produced in court." *Id.* at 1062. *Esteve* does not support the proposition asserted by Defendant. The issue in *Esteve* was whether the records were testimonial in nature and whether their admission into evidence violated the Confrontation Clause of the Sixth Amendment. The *Esteve* court did not address whether the records were admissible without a proper evidentiary foundation.

"[T]he trial court has great latitude in resolving th[e] issue of trustworthiness." *United States v. Parsee*, 178 F.3d 374, 380 (5th Cir.), *cert. denied*, 528 U.S. 988, 120 S.Ct. 450 (1999), *and cert. denied,* 528 U.S. 988, 120 S.Ct. 465 (1999). The *Parsee* court noted that the "[a]ppellants made no attack on the information contained in the records and offered no credible reason to doubt their trustworthiness. The challenged records were duly authenticated and kept in the regular course of business." *Id.* The court rejected the challenge to the records. Federal Rule of Evidence 803(6), like La.Code Evid. art. 803(6), provides that

22

records of a regularly conducted activity are not hearsay under certain circumstances and requires a party opposing the admission of the records to show whether "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

In a discussion outside the presence of the jury on September 7, 2018, the third day of trial, counsel for the State indicated the trial judge decided the records would not be admitted because Ms. Matthews's testimony "made the records less credible." The records showed Ms. Matthews was not working on November 4, 2015. The subpoena that produced that information requested records from January 1 to November 7, 2015; those records were sent to the office of the trial judge. However, the affidavit accompanying the records did not state the requested date range nor state they were all the records for a particular date range. Nevertheless, the last page of the records shows they were produced from a search of dates from January 1, 1800, to December 31, 9999.

The trial court indicated "the affidavit really didn't authenticate the range that was requested." It initially indicated that the records would "probably" be admitted into evidence. However, after Ms. Matthews testified that she worked past November 7, 2015, until 2016, the trial court did not allow the records into evidence.

As previously noted, Ms. Matthews testified that she did recall whether she worked on November 4, 2015. The records showed that the last day Ms. Matthews worked was October 29, 2015. The trial court was concerned that the records were not self-authenticating:

> So yesterday when we were talking about to what extent was the document and the affidavit in support of it fully self-authenticating, and I was concerned that it was incomplete about exactly how long Ms. Matthews worked at Love's. And Mr. Matus said, "Well, it's shown on the records themselves because it says that the request was made for the years 1800 to 9999."

23

So I thought that was weak as authenticating that the request was for every day she worked between those years, two centuries ago and eight millennia forward.

So then when the testimony came in that Ms. Matthews testified without contradiction that she actually worked at Love's through 2016, and she's subject to cross-examination and this record is not, and then Mr. Matus says this morning, "Well, maybe it is true that she worked on November 8, 2015; we just requested through November 7, 2015" –

So now I'm certain that the exhibit is not self-authenticating because it does not – it does not anywhere say accurately what periods of time are covered by these records of the dates that she worked.

Defense counsel objected, noting the subpoena duces tecum had specifically requested records until November 7, 2015, and that was "why those records would only be to November 7th." The trial court replied that the exhibit had to be "fully self-authenticating, and it's not."

"The district court is awarded vast discretion in its decisions on evidentiary rulings, and its decision to admit or exclude evidence will not be reversed on appeal absent a clear showing of abuse of that discretion." *Young v. Joy*, 09-756, p. 2 (La.App. 3 Cir. 2/3/10), 30 So.3d 1116, 1119. The dates on the Love's records did not match the requested dates on the subpoena duces tecum. Ms. Matthews's testimony was that she worked past the dates shown in the records, worked throughout a pregnancy, had a baby, and continued to work at Love's for a full year after the dates shown on the records, all of which supports the likelihood, or at least the possibility, that the records were incorrect. Ms. Matthews's testimony caused the trial court to question the trustworthiness of the Love's records to the point it did not believe they satisfied the requirements of La.Code Evid. arts. 803(6) and 902(11), which require the records to indicate trustworthiness in order to be self-authenticating. We are convinced that the trial court's decision to exclude the records here was not an abuse of discretion and should not be disturbed. Defendant's third assigned error lacks merit.

24

### _Assignment of Error Number Four_

Defendant alleges that the trial court erred when it overruled his objections to improper cross-examination by the State's counsel, and he seeks a new trial because of the alleged improper questioning.

Prior to Defendant's testimony, the victim had testified without objection about finding cream in the bedroom Defendant and Ms. Matthews shared. She said Defendant rubbed it on his private before he put his private in her. On cross-examination of Defendant, the State's counsel established that Ms. Matthews and Defendant kept lubrication in their bedroom drawer. State's counsel then asked, "How do you think this child knew about the cream in your drawer?" Defense counsel objected on grounds of speculation, and the trial court overruled the objection. The State's counsel rephrased the question to, "How do you know the child knew about that?" to which Defendant replied, "Because they dig in our room."

Defendant had already testified that he and Ms. Matthews kept pornography and sexual material around the house, and he had explained that he tried to keep the children out of their bedroom because they kept "sexual stuff" there. Defendant had also admitted that the children found pornography in he and Ms. Matthews's bedroom. Defense counsel did not object to any of these questions.

The victim had already graphically described how she knew about the cream. The jury already knew it was in a drawer in Defendant's bedroom. The jury also already knew, from Defendant's testimony to which counsel did not object, that pornography was present and where it was kept. Thus, answers to the questions about which Defendant now complains were previously presented to the jury without objection, and the specific testimony about which he now complains was merely cumulative. Accordingly, we find that the trial court did not err by allowing this testimony that was previously adduced.

Counsel did object on grounds of relevance when the State asked Defendant how often he watched pornography. The State's counsel argued, "they've already brought up the pornography tape." He believed the frequency of Defendant's pornography viewing was "quite relevant because this is part of the child learning or the child having access to that type of sexual explicity." The trial court overruled the objection, and Defendant responded, "I don't watch it without Summer and [Ms. Matthews]. When we have intimate relationships we watch that."

We hold that the frequency with which Defendant watched pornography had no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art. 401. Thus, it was not relevant, and the trial court should have sustained the objection.

Nevertheless, the trial court's failure to sustain the objection may be harmless error if the State proved beyond a reasonable doubt that it did not contribute to the verdict and that the jury's verdict was surely unattributable to the error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967); *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081 (1993). "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan*, 508 U.S. at 279.

The State had already established pornography was present in the home. The victim had found a pornographic video in her mother and Defendant's bedroom, which the children then viewed. The jury could reasonably conclude that Defendant watched pornography, even if it was unable to conclude the frequency with which he did so.

Unrefuted evidence at trial showed the victim had vaginal and anal scarring indicating she had been sexually abused. The victim testified Defendant was her abuser. The jury had the opportunity to observe the victim and assess her credibility and the credibility of Defendant. The jury could have determined Defendant's guilt beyond a reasonable doubt on this evidence alone. The frequency with which Defendant viewed pornography did not influence that evidence or cast any doubt on it in any way. We find that the trial court's failure to sustain Defendant's objection did not contribute to the verdict and the verdict was surely unattributable to the trial court's error. Thus, the error was harmless.

When the State's counsel commented, "You seem to be pretty sexually active[,]" the trial court sustained Defendant's objection. Defense counsel raised no further objection, no request for the jury to disregard the statement, and no motion for a mistrial. The State's counsel then moved on to another line of questions. On appeal, Defendant argues the comment about his sexual activity "highlighted the prosecutor's motive in delving into this line" of improper questioning which "served no legitimate purpose other than . . . to show [Defendant] in a bad light."

The trial court agreed with Defendant when the comment was made. Defendant made an objection, it was sustained, and Defendant made no further effort to preserve any issue regarding this comment for appeal. Thus, we decline to consider this argument pursuant to La.Code Crim.P. art. 841(A).[5]

---

[5] An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

La.Code Crim.P. art. 841(A).

## *Assignments of Error Numbers Five and Six*

Defendant contends the non-unanimous, eleven-to-one, jury verdict violated his rights set out in the Sixth and Fourteenth Amendments of the Constitution of the United States as interpreted by the courts. At the time of the charged offenses and at the time of Defendant's conviction, La.Code Crim.P. art. 782(A) provided that a defendant charged in a case "in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict." This language reflected the provisions of La.Const. art. 1, §17 in effect at the time.[6]

The Louisiana Attorney General's Office (AG) filed a brief with this court in opposition to Defendant's constitutional challenges. The AG first notes that Defendant did not serve the AG's office with the motion for new trial filed in the trial court, thus depriving it of an opportunity to respond to the allegations of unconstitutionality. Citing *Mudge v. Plaquemines Par. Council,* 16-587 (La. 4/22/16), 192 So.3d 735 (per curiam), the AG submits that this procedural defect precludes us from addressing the issue on appeal. Therein, the supreme court vacated a trial court judgment declaring a parish ordinance unconstitutionally vague as procedurally defective because "the attorney general was not served with the

---

[6] Recently, in the November 6, 2018 election, Louisiana voters opted to require unanimous verdicts in some instances. The amendment to La.Const. art. 1, §17 states:

> (A) Jury Trial in Criminal Cases. A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict.

The issue of non-unanimous jury verdicts is pending before the United States Supreme Court in *Ramos v. Louisiana*, ___ U.S. ___, 139 S.Ct. 1318 (2019). Until the Supreme Court rules otherwise, the pre-amendment provision and La.Code Crim.P. art. 782(A), which apply because of the date on which Defendant committed the offense, are not unconstitutional. *See State v. Bertrand*, 08-2215, 08-2311 (La. 3/17/09), 6 So.3d 738.

pleading challenging the constitutionality of the ordinance as required by La.Code Civ. P. art. 1880." *Id.* at 736. The AG also contends that Defendant failed to specifically and sufficiently plead his equal protection argument in the trial court.

The certificate of service on Defendant's motion for new trial shows service only on the Assistant District Attorney. In addition, Defendant did not make a specific equal protection argument in his motion for new trial or at the hearing of the motion. Although the motion alleged a violation of the Fourteenth Amendment, it argued only a due process violation and not an equal protection violation. Because the AG was not given the opportunity to be heard in the trial court, we decline to consider Defendant's fifth and sixth assignments of error.

### *Assignment of Error Number Seven*

Defendant used all twelve of the peremptory challenges allotted to him at trial. He also challenged fourteen potential jurors for cause. The trial court granted the majority of those challenges, but it denied Defendant's challenges regarding Jeanette Simon, James Barbin, Barry Beller, and Viola Carrier. Defendant now asserts that the denial of those challenges deprived him of his constitutional right to a fair and impartial jury.

"Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." *State v. Juniors*, 03-2425, p. 7 (La. 6/29/05), 915 So.2d 291, 304, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006). Challenges for cause are regulated by La.Code Crim.P. art. 797, which provides, in pertinent part:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> . . . .
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he

29

declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

In *State v. Dotson*, 16-473, p. 5 (La. 10/18/17), 234 So.3d 34, 39 (citations omitted), *writ denied*, 18-177 (La. 12/17/18), 259 So.3d 340, the supreme court explained:

> *Voir dire* examination of prospective jurors is designed to discover bases for challenges for cause and to secure information for an intelligent exercise of peremptory challenges. The questions propounded are designed to determine any potential adverse influence on the prospective juror's ability to render an impartial verdict. A prospective juror's responses during *voir dire* cannot be considered in isolation.

In *State v. Clark*, 12-508, p. 98 (La. 12/19/16), 220 So.3d 583, 663, (citations omitted), *cert. granted, judgment vacated on other grounds*, __ U.S. __, 138 S.Ct. 2671 (2018), our supreme court noted:

> A challenge for cause should be granted even when a prospective juror declares his ability to remain impartial if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably inferred. Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges.

The *Dotson* court, 234 So.3d at 39-45 (some citations omitted), further expounded:

> A trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire *voir dire* reveals the judge abused his discretion. The trial judge's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence.
>
> . . . .

Clearly, La. C.Cr.P. art. 797(2) does not require that a prospective juror state with absolute certainty that he/she cannot be impartial in order to be removed for cause. However, in the absence of such a statement, the trial court's denial of a challenge for cause will not be reversed if, on review of the entire *voir dire* examination, the prospective juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Reversal is appropriate only where it appears, upon review of the *voir dire* examination as a whole, that the trial judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused. This standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys." "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record." As noted in [*State v. Miller*], 99-0192 (La. 9/6/00), 776 So.2d 396, because of the "complicated and oftentimes daunting" task faced by a trial court in deciding "challenges for cause of prospective jurors who give equivocal . . . responses during *voir dire*," "an appellate court should accord great deference to the [trial] court's ruling on a challenge for cause, which is necessarily based, in part, on the court's personal observations during questioning." *Id.*

The *Dotson* court found the trial court's determination of the juror's competency was not arbitrary or unreasonable and did not result in the "prejudicial injury of the defendant in obtaining a fair and impartial trial." *Id.* at 45. Thus, the appellate court erred by reversing the trial court's denial of the challenge for cause.

According to *Clark*, 220 So.3d 583, a party is limited on appeal to arguing the grounds he stated in his challenge for cause. At trial, the *Clark* defendant failed to argue a potential juror's "unspecified familial relationship to law enforcement officers was a basis for challenging her[.]" *Id.* at 667. Thus, he did not properly preserve that argument for appeal and was limited on appeal to the concerns he had expressed at trial.

"[A] challenge for cause should be granted even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render a judgment according to the

law may be reasonably implied." *State v. Sparks*, 88-17, p. 24 (La. 5/11/11), 68 So.3d 435, 461, *cert. denied*, 566 U.S. 908, 132 S.Ct. 1794 (2012).

In *State v. Record*, 18-614, pp. 11-12 (La.App. 3 Cir. 2/27/19), 266 So.3d 592, 602, this court explained:

> [Louisiana Code of Criminal Procedure Article] 800(A) requires an objection at the time of the ruling, which denies a challenge for cause, in order to preserve the claim for appellate review. Article 800(A) also mandates that the nature of the objection and the grounds therefor be stated at the time of the objection. With respect to that provision, this court has made clear:
>
>> Our law is also settled that an objection need not be raised by incantation. "It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor." C.Cr.P. 841; *State v. Boutte*, 384 So.2d 773 (La. 1980). The requirement that objection be raised contemporaneously is not meant to be inflexible, but is designed "to promote judicial efficiency and to insure fair play." *State v. Lee*, 346 So.2d 682, 684 (La. 1977). Article 800 should not be read to differ in this respect from Article 841.
>
> *State v. Vanderpool*, 493 So.2d 574, 575 (La. 1986).
>
> *State v. Clark*, 12-508, p. 99 (La. 12/19/16), 220 So.3d 583, 663, *cert. granted, judgment vacated on other grounds*, __ U.S. __, 138 S.Ct. 2671 (2018).
>
> The *Clark* court found the defendant could not assign error to the denial of a challenge for cause because he failed to lodge a contemporaneous objection to the trial court's denial.

The United States Supreme Court considers the process of *voir dire* to be one that "usually identifies bias." *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892 (1984). The trial court's rulings concerning *voir dire* are largely based on credibility and demeanor. *Id.* Thus, "the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'" *Id.*

32

In the instant matter, Defendant made no objection to the denial of his challenges regarding Ms. Simon and Mr. Barbin. Because he failed to do so, we hold that Defendant is precluded from appealing the trial court's denial of his challenges for cause regarding those two potential jurors. *See Clark*, 220 So.3d 583; *State v. Anderson*, 06-2987 (La. 9/9/08), 996 So.2d 973, *cert. denied*, 556 U.S. 1165, 129 S.Ct. 1906 (2009).

We will now address the propriety of the trial court's denial of Defendant's challenges for cause regarding Mr. Beller and Ms. Carrier.

*Barry Beller*

During voir dire, Mr. Beller stated that when his stepdaughter was six or seven, the mentally retarded brother of her babysitter kissed her. The man was around thirty years old. Mr. Beller and his wife spoke to the police, but "[t]he police happened to be a family member of that family and tried to talk [them] out of going any further with it." Ultimately, Mrs. Beller did not want her child to have to testify, and they decided not to pursue the issue. Mr. Beller's son was treated a little differently at school because some of the people there knew of the incident involving his stepdaughter. The problem "stuck with [them] for a little while" until Mr. Beller's son went to a different school.

Mr. Beller fully believed his stepdaughter. He admitted he presumed the man to be guilty, and the discussion of the present case in *voir dire* "just kind of hit close to home." Nevertheless, he thought he could give Defendant the full presumption of innocence and not assume his guilt because of the victim's allegations. Although Mr. Beller felt strongly about his stepdaughter's case, he could set aside his feelings and not make preconceived conclusions about who was telling the truth.

Mr. Beller admitted "[t]here may be a chance" he would bring memories of his stepdaughter's situation into the jury room. He would not know if it would cause

him a problem until he heard "what went on" in this case. Nevertheless, he still believed he "could be fair and listen to . . . what's presented in the case and give [Defendant] that opportunity." He did not think he would take out his resentment on Defendant. He would not in advance favor one person's testimony over another.

Mr. Beller was troubled by incidents concerning social media where someone makes an allegation, and the accused basically has to prove his innocence. He did not think a person should "be vilified" because someone said he did something without facts or proof to support it. He believed "a lot of times [the news media] give a story without all the facts just to get the headline out there, and then fill in the blanks later."

Defense counsel asked the court to strike Mr. Beller for cause, pointing out the similarity between this case and the one involving Mr. Beller's stepdaughter. The victim here was eight years old; Mr. Beller's stepdaughter was six or seven. Both alleged perpetrators were adult men. Mr. Beller went to counseling with his stepdaughter, and the issue followed them for years. He thought it might follow him into the jury room. Even though Mr. Beller said he could be fair and follow the law, defense counsel argued the totality of his testimony showed the case upset him and he would not be an appropriate juror.

The trial court saw Mr. Beller as "a particularly strong juror" and noted that it was "convinced that [Mr. Beller] could be fair." Thus, it denied the challenge for cause.[7] After review, we conclude that the totality of the *voir dire* shows that while Mr. Beller still carried emotions about what happened to his stepdaughter, he was able to separate those emotions from Defendant's case. Mr. Beller exhibited

---

[7] Defendant's appellant brief also notes Mr. Beller's sister was assaulted in high school. Because Defendant failed to argue this as a reason for Mr. Beller to be excused in the trial court, we will not consider this argument in the determination of whether Mr. Beller should have been removed for cause. *See Clark*, 220 So.3d 583.

34

understanding about the presumption of innocence and the necessity of proof in order to convict Defendant. The record shows Mr. Beller, like the juror in *Clifton*, 165 So.3d 387, could be fair and impartial and reach a conclusion based on evidence. Accordingly, we conclude that the trial court did not err in denying this challenge for cause.

*Viola Carrier*

Defense counsel noted that Ms. Carrier was wiping her eyes during the *voir dire*. She indicated she was emotional and preferred to continue the discussion privately. Ms. Carrier's further questioning took place only before counsel and the trial court. She explained she was "not a people person." She got emotional because she was "in front of a lot of people." She later said she "just got emotional that a 13-year-old got raped." However, she then said she was crying because she was "just nervous."

When asked whether she could use "fairness and common sense," Ms. Carrier answered "No," but she could not say why. She thought she would have trouble speaking out in a jury situation because she was somewhat afraid to talk in front of people.

During the discussion of challenges, defense counsel said:

> I like [Ms. Carrier], but I think she's got some emotional issues. She was crying when we were talking about this stuff. And quite frankly, I don't think that the record was – I don't think that the cold record will read of what was going on when she was in here in this little room.

Defense counsel also believed Ms. Carrier "demonstrated some lack of understanding about the process[.]" Counsel for the State pointed out "there was nothing brought up about any sexual – nothing." The trial court noted that Ms. Carrier was "very nervous about being here, and she's uncomfortable, and she doesn't like crowds, she doesn't like speaking up, but there wasn't any indication

that she couldn't be fair." It denied the challenge for cause, and Defendant used his second peremptory challenge.

Ms. Carrier attributed much of her displayed emotion to nervousness and shyness, and she could not articulate any reason she could not use fairness and common sense. While a challenge for cause should be granted when potential jurors indicate an inability to be fair and impartial or decide the case based on the evidence, we concluded that an emotional personality is not sufficient grounds to exclude a juror for cause. Ms. Carrier attributed much of her displayed emotion to nervousness and shyness. The trial court did not err in denying Ms. Carrier's challenge for cause.

Defendant's seventh assigned error lacks merit.

### **DECREE**

Defendant's conviction is affirmed but his sentence is vacated. This matter is remanded to the trial court for resentencing to a term that is not excessive, with the designation of a specified portion of the term to be served without benefit of parole, probation, or suspension of sentence. The trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 at resentencing.

**CONVICTION AFFIRMED, SENTENCE VACATED, AND REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**